IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

2013 DEC 16 PM 12:50

**BENTON COUNTY WIND FARM LLC,**

**Plaintiff,**

**v.**

**DUKE ENERGY INDIANA, INC.,**

**Defendant.**

1:13-cv-1984 SEB -TAB

Cause No. ____________________

## COMPLAINT

Plaintiff Benton County Wind Farm LLC ("BCWF"), by and through its undersigned attorneys, hereby avers and alleges for its complaint against Defendant Duke Energy Indiana, Inc. ("Duke"), as follows:

## NATURE OF THE ACTION

1. By this action, Plaintiff BCWF seeks to recover damages caused by Defendant Duke's intentional and ongoing breach of two contracts. The first contract is a Renewable Wind Energy Project Purchase Power Agreement (the "Power Purchase Agreement" or "PPA") dated September 1, 2006. The second is a Joint Energy Sharing and Operating Agreement (the "JESOA") dated December 19, 2007.

2. The Power Purchase Agreement is a commodity off-take contract – commonly referred in the power industry as a "take or pay" agreement – in which BCWF agreed to sell to Duke, and Duke agreed to buy, for a term of twenty years, all of the electrical power BCWF could produce from a wind generation facility that BCWF constructed in Benton County, Indiana

(the "Wind Farm").[1] BCWF agreed that during the contract term, it would sell Duke all of the power the Wind Farm was able to generate. In return, Duke agreed that it would "pay" BCWF for all of the power the Wind Farm was able to generate, regardless of whether Duke determined to accept delivery of (i.e., "take") such power. Only in the event of a narrowly defined "Emergency Condition" or "Force Majeure Event" would Duke be excused from its obligation to compensate BCWF for power the Wind Farm was able to generate.

3. Duke sells all of the power it receives from the Wind Farm through a wholesale commodity market for electricity run by the Midcontinent Independent System Operator ("MISO") – the entity responsible for administering the regional electrical grid covering Duke's service area. As set forth below, electric power is procured through this market based on the lowest supplier cost, and MISO directs some electric facilities not to run at all if the power those facilities produce is too expensive. Under the Power Purchase Agreement, Duke pays BCWF a fixed price for each unit of electricity BCWF is able to generate, regardless of the revenues Duke is able to obtain through its MISO re-sales. The MISO re-sale prices are affected by many factors and fluctuate constantly, often within a single hour. Under the PPA, Duke bears all risks arising from these market fluctuations. Thus, even when Duke cannot resell BCWF's power at a profit, it is still obliged to pay BCWF the same fixed price for all of the power the Wind Farm is able to generate – not just what Duke decides to accept and then resell.

---

[1] In 2005, Duke issued a Request for Proposal for the first wind farm to be developed in Indiana. When Duke and BCWF entered into the Purchase Power Agreement, the Wind Farm was expected to have a total capacity of approximately 100 megawatts and Duke agreed to purchase all of its electrical output. Later, BCWF increased the size of the Wind Farm to approximately 130 megawatts and reached an agreement to sell the additional 30 megawatts of the Wind Farm's output to a third party (Vectren), with Duke continuing to be obligated to purchase the remainder of the Wind Farm's output. Duke's obligations under the PPA (including those at issue in this suit) otherwise remained in place.

4. In addition to bearing the risk of market price fluctuations, Duke agreed in both the PPA and JESOA that it, and not BCWF, would participate in the MISO markets and would pay any and all MISO-imposed costs incurred in selling the Wind Farm's power into those markets, including the costs of transmitting the power to consumers, even if those costs changed during the term of the PPA. Duke also agreed in the PPA that as MISO market participant, it would "reasonably cooperate" with BCWF in "bidding and scheduling" the sale of the Wind Farm's power into MISO. Finally, Duke agreed in the PPA and JESOA that it would not "curtail or reduce" the Wind Farm's output.

5. Taken together, the above terms were intended to enable BCWF to generate a steady and predictable stream of revenue during the twenty-year life of the PPA, in return for BCWF undertaking the risks of developing, constructing and operating the Wind Farm to generate power exclusively for Duke. Duke understood from the outset that the Wind Farm required a long-term, reliable and uninterrupted revenue stream in order to obtain the millions of dollars of financing necessary for the Wind Farm's construction. As stated by Duke's President, Kay Pashos, in sworn testimony before the Indiana Utility Regulatory Commission (the "IURC"),[2] "[t]he reality is that the Benton County Wind Energy Project will not get financed and built without such a long-term commitment from Duke Energy Indiana. Many millions of dollars need to be invested in this project and the availability and success of that investment is dependent upon the stream of revenues to be produced through the full term of the [Power Purchase Agreement]."

---

[2] As set forth below, Ms. Pashos and several other Duke executives testified in support of Duke's petition to the IURC for approval of the PPA and for permission to pass Duke's costs under the PPA on to Duke's electricity customers.

6. BCWF has duly performed its obligations under the Power Purchase Agreement, relying on the promise of the PPA revenues in spending millions of dollars to develop and construct the Wind Farm. From May 2008 (when the Wind Farm was commissioned) through February 2013, the parties performed their respective obligations under the PPA and JESOA without disagreement. In March 2013, however, in order to avoid the very market risks Duke agreed to accept in the PPA, Duke took steps to reduce BCWF's ability to generate and sell power. Specifically, Duke has forced BCWF to curtail electrical production by refusing to offer the Wind Farm's power to MISO at competitive prices and then refusing to compensate BCWF when the Wind Farm is directed by MISO not to produce power. By so doing, Duke has effectively prevented the Wind Farm from generating power any time the market price for electricity drops below [redacted].

7. Duke's ability to impose this [redacted] results from a change in MISO's market rules for wind-powered generating plants that went into effect on March 1, 2013. Under MISO's new rules, Duke and other sellers of wind power are now required to submit price offers to MISO for power they propose to sell into MISO's markets. MISO uses these price offers to determine which plants should run and to set market clearing prices at each location on its system, based on all of the price offers submitted and the proximity of the sellers' power generation facilities to transmission constraints on the MISO system. When a market participant's price offer is too high, MISO, through an automated system, will send an electronic signal indicating that the power facility should reduce its production of power. Thus, whenever the market clearing price for power is lower than [redacted], the Wind Farm reduces its power generation below what it is otherwise able to produce.

8. [redacted].

Previously, and consistent with its contractual obligations, Duke [redacted]. Now, under Duke's new bidding practices, Duke [redacted], with the result that the Wind Farm has frequently been forced to curtail operations. As a result, the Wind Farm's electrical output and revenues have been sharply reduced.

9. [redacted]. Duke's position is contrary to both the letter and spirit of the PPA. Duke is obliged to compensate BCWF for the Wind Farm's <u>entire</u> output, not merely what Duke chooses to accept based on prevailing market prices. Duke's refusal to compensate BCWF for generation lost due to Duke's bidding practices is a direct violation of: (i) Duke's agreement to pay BCWF without regard to the price Duke can realize on re-sale; and (ii) Duke's agreement to bear responsibility for all costs arising from changes in the price of energy, changes in MISO's market rules, and any other costs that might arise in connection with Duke's sale of BCWF's power into the MISO markets. In addition, Duke is in direct violation of

its promise not to "curtail or reduce" the Wind Farm's output, which is exactly what Duke has done through its arbitrary, bad faith bidding practices.

10. BCWF seeks compensatory damages based on Duke's breach of the parties' contracts (Count I), as well as Duke's breach of its implied duty not to hinder BCWF's performance (Count II), and Duke's breach of its express contractual duty of good faith and fair dealing (Count III). In addition, BCWF seeks an Order declaring that Duke's conduct is contrary to its contractual obligations (Count IV).

## PARTIES

11. BCWF is a Delaware limited liability company. It owns and operates a wind power project with a nameplate capacity of 130.5 megawatts ("MW") located in Benton County, Indiana. BCWF's members are Benton County Holding Company LLC and Aircraft Services Corporation. Benton County Holding Company LLC – BCWF's Managing Member – is a Delaware limited liability company. Its members are Orion BC Holdings LLC and Vision Energy LLC. Orion BC Holdings LLC is a Delaware limited liability company whose sole member is Orion Energy Group LLC ("Orion"). Orion's four members, Michael Haas, Reid Buckley, James Eisen and Scott Healy, are citizens of California. Vision Energy LLC is an Ohio limited liability company whose sole member is J. Turner Hunt. Mr. Hunt is a citizen of Ohio. Aircraft Services Corporation, an indirect, wholly-owned subsidiary of General Electric Capital Corporation, is incorporated in Nevada and maintains its principal place of business in Connecticut. Aircraft Services Corporation is a non-managing member of BCWF and does not control its day-to-day affairs.

12. On information and belief, Duke is incorporated in Indiana and has its principal place of business in Hendricks County, Indiana. Duke is Indiana's largest electric utility, serving

over 750,000 customers in the state. On information and belief, Duke is a wholly-owned subsidiary of Duke Energy Corporation, the largest electric power holding company in the United States, supplying and delivering energy to approximately 7.2 million customers nationwide.

## JURISDICTION AND VENUE

13. Jurisdiction is proper pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between BCWF and Duke and the amount in controversy exceeds $75,000, exclusive of interest, attorney's fees, and costs.

14. Venue is proper in this District pursuant to 28 U.S.C. § 1391(d) because Duke is incorporated in Indiana and its principal place of business is located in this District.

## FACTUAL ALLEGATIONS

### MISO's Energy Markets

15. As set forth above, Duke sells all of the power it purchases from BCWF into MISO's electric wholesale markets. MISO is a "Regional Transmission Operator" ("RTO"), a non-profit entity formed with the authorization of the Federal Energy Regulatory Commission. RTOs are responsible for coordinating, controlling and monitoring the operation of the electrical power grid and administering the wholesale electricity markets within their jurisdiction.

16. The price at which a party can sell power into MISO's wholesale markets is referred to as a "locational marginal price" ("LMP"). LMPs are calculated by MISO using a computer algorithm and vary significantly depending on the precise location and time at which a seller seeks to supply power to the grid. Two significant factors affecting LMPs are: (i) price bids submitted by parties offering to sell energy into MISO's markets; and (ii) costs calculated

by MISO relating to "congestion," which occurs when power generators seek to use crowded transmission lines and other facilities with limited capacity. At times, LMPs can be negative. When an LMP is negative – for example, negative $20 per megawatt-hour ("MWh") – the seller must pay $20 in order to sell that unit of power into MISO's markets. Although negative LMPs ordinarily discourage sellers from delivering and selling power at congested locations, certain generators may nevertheless choose to pay these congestion-related negative LMP charges for a variety of reasons.[3]

**Duke Agrees to Purchase All Power Generated by the Wind Farm over a Twenty-Year Period and Accepts All Risks of Market Fluctuation and Delivery-Related Costs**

17. Duke is a regulated utility with the obligation to provide electricity to the customers in its service area. It procures electric power from many different generation resources in satisfying this obligation and its other business goals.

18. In 2004, Duke began to consider procuring wind energy to provide additional diversity in its generation resources. Although wind energy had become popular in other regions of the country, in 2004 there were no wind power generators operating in Indiana. In 2005, Duke issued a Request for Proposals ("RFP") for 100 MW of renewable energy. Six entities responded to the RFP with specific wind project proposals. Duke analyzed these proposals based on a variety of factors including price, accessibility, experience, financial stability,

[3] For example, owners of renewable energy-powered facilities such as wind facilities may receive "production tax credits" ("PTCs") from the federal government as well as market-based "renewable energy credits" for each unit of electricity they sell. The value of these credits can outweigh the expense of paying negative LMP charges. Similarly, fossil-fueled or nuclear plants might accept negative prices for certain periods of time in order to avoid the costs resulting from stopping and then restarting their generation facilities.

location and overall viability. Based on this analysis, Duke selected a proposal for the sale and purchase of power from BCWF's Wind Farm.

19. On September 1, 2006, following extensive negotiations by the parties, BCWF and Duke entered into the Power Purchase Agreement. A true and correct copy of the Power Purchase Agreement is attached hereto as Exhibit A.

20. Like other "take or pay" contracts, the PPA requires Duke to "accept and purchase from" BCWF the "entire electric energy output of [the] Wind Farm." *See* Power Purchase Agreement, Article I, p. 4 (definition of Electrical Output), § 2.1 (term of agreement), § 4.1 (purchase obligation). The fixed purchase prices agreed to by Duke are set forth in Exhibit A to the Power Purchase Agreement. *See* PPA § 4.4.

21. Duke agreed that if it failed to accept delivery of the Wind Farm's electrical output, it would pay BCWF liquidated damages reflecting the value of the energy the Wind Farm generated (or would have generated), plus the pre-tax value of any PTCs lost due to Duke's failure to accept the output. *See* PPA § 4.6. Under the Power Purchase Agreement, Duke's obligation to pay is excused <u>only</u> where BCWF fails to perform, a Force Majeure Event or an Emergency Condition arises, or where Duke is entitled to exercise suspension rights. *See* PPA §§ 4.6, 15.2. The PPA specifically states that a "Force Majeure Event does not include . . . changes in market conditions that affect the price of energy or capacity." PPA § 14.1(b)(iii). Similarly, in defining what constitutes an Emergency Condition, the PPA excludes "any condition or situation that results . . . solely from economic conditions." *See* PPA, Article I, p. 4 (definition of Emergency Condition); *see also* the Amended and Restated Large Generator Interconnection Agreement ("Interconnection Agreement"), dated March 29, 2007 (as amended

October 11, 2007), between Duke, Northern Indiana Public Service Company ("NIPSCO") and MISO, Article I, p. 4 (same).

22. Under the Power Purchase Agreement, Duke agreed that once it accepted power delivered by BCWF, it would bear the entire responsibility (including all economic risk) for selling the power to MISO or other third party buyers – including but not limited to the payment of any costs Duke might incur in delivering or transmitting the power. For example, in Section 6.4 of the PPA, Duke represented and agreed as follows:

> Buyer [i.e., Duke] intends to deliver and sell all of the Electrical Output to [MISO] at the Point of Metering and does not intend to utilize any Transmission Services. If Buyer nevertheless utilizes Transmission Services for the Electrical Output during the Term or is required (due to a change in the applicable transmission rules) to use Transmission Services in order to accept deliveries of the Electrical Output at the Point of Metering, then Buyer shall be responsible for arranging for all Transmission Services required to effectuate Buyer's acceptance of delivery and purchase of Electrical Output, including, without limitation, obtaining Transmission Service, in an amount of capacity equal to the Designated Nameplate Capacity Rating, and shall be responsible for the payment of any charges related to such Transmission Services hereunder, including, without limitation, charges for transmission or wheeling services, ancillary services, imbalance, control area services, congestion charges, location marginal pricing, transaction charges and line losses. The Parties acknowledge that the purchase price of Electrical Output does not include charges for such Transmission Services, all of which shall be paid by Buyer.

PPA § 6.4.

23. Duke further agreed that where delivery and sale of power to MISO or other parties requires the submission of bids, Duke would cooperate with BCWF on such bidding. Section 6.2 of the PPA provides that:

> The Parties will reasonably cooperate with each other with respect to the bidding and scheduling with NIPSCO and/or the RTO [i.e., MISO] of the Electrical Output to be sold and delivered by Seller and accepted and

> purchased by Buyer. Buyer will be responsible for all such bidding and scheduling.

PPA § 6.2. Section 6.3 of the Power Purchase Agreement goes on to state that "nothing in Section 6.2 . . . shall require Seller [i.e., BCWF] to take any action effecting, or which would otherwise result in, any reduction in the Electrical Output or cause Seller to incur additional costs as a result of such provisions." *See* PPA § 6.3.

24. In July 2007, BCWF entered into an agreement with another electric utility, Southern Indiana Gas and Electric Company d/b/a Vectren Power Supply, Inc. ("Vectren"), to sell to Vectren up to 30 MW of the power generated by the Wind Farm.[4] On December 19, 2007, BCWF, Duke, and Vectren entered into the Joint Energy Sharing and Operating Agreement (the "JESOA"). Under the JESOA, Duke continues to be responsible for purchasing all power not allocated to Vectren under the JESOA. A true and correct copy of the JESOA is attached hereto as Exhibit B.[5]

25. Like the Power Purchase Agreement between BCWF and Duke, the JESOA makes clear that Duke and Vectren bear the entire economic responsibility for bidding BCWF's power into MISO's electricity markets, and for paying any costs related to the delivery of power to MISO. Section 3.2(a) of the JESOA states that:

> Duke and Vectren shall each be responsible for submitting their own bids and offers for their respective Shares of the Total Facility Output, . . . at their respective Nodes and for scheduling their respective Shares of the Total Facility Output . . . from and after the Delivery Point. Duke and Vectren shall each pay all costs and charges, including scheduling costs,

---

[4] Vectren's performance of its obligations to BCWF is not at issue in this action.
[5] The parties to the JESOA agreed that where the terms of the JESOA and Power Purchase Agreement conflict, the JESOA controls. *See* JESOA § 8.5.

> imbalance charges, congestion costs and other RTO charges, associated with their respective Shares of the Total Facility Output . . . .[6]

*See* JESOA § 3.2(a); *see also* JESOA § 2.5 ("Duke and Vectren shall each be responsible for all transmission of the respective Shares of the Total Facility Output from the Delivery Point").

26. Like the Power Purchase Agreement, the JESOA also makes clear that Duke and Vectren are not permitted to limit BCWF's power output. Section 2.4 of the JESOA states that "[e]xcept to the extent expressly provided in the respective PPAs, neither Duke nor Vectren shall have the right to curtail or reduce the Total Facility Output."

27. Taken together, the Power Purchase Agreement and the JESOA ensured that BCWF would be able to operate at full capacity whenever wind conditions were sufficient, and thereby generate the maximum possible stream of revenues during the PPA's twenty-year term.

**Duke Confirms Its Obligations to BCWF and Acceptance of All Market Risks in Testimony Before the Indiana Utility Regulatory Commission**

28. By its terms, the Power Purchase Agreement could not become effective unless Duke secured an order from the IURC that approved the contract and that Duke, in its sole discretion, found acceptable. PPA §§ 3.1(a); 3.2(a). Duke filed a Verified Petition (the "Petition") with the IURC on August 15, 2006 seeking approval of the PPA and authorization to recover, through its rates, the costs Duke agreed to bear in connection with the contract. On December 6, 2006, the IURC issued an order (the "IURC Order") granting Duke's Petition. On December 27, 2006, Duke certified to BCWF that the IURC Order was acceptable to Duke.

29. Several Duke executives provided testimony to the IURC in support of Duke's Petition. Duke's testimony confirms that: (i) the Power Purchase Agreement is a "must run" or

---

[6] References to sales of test energy have been omitted as they have no bearing on the parties' present dispute.

"take or pay" contract; (ii) Duke is responsible for paying all transmission and congestion-related costs incurred in selling BCWF's power into the MISO markets; and (iii) Duke must continue to perform its obligations under its agreements with BCWF notwithstanding future changes in the power markets or in MISO's market rules.

30. Duke's President Kay Pashos testified that approval of the Power Purchase Agreement with BCWF would represent "a first step in the development of commercial wind generation in Indiana," and that, if successful, "the environmental and economic benefits it offers are likely to be replicated through additional wind resources in the State." Direct Testimony of Kay Pashos, IURC Cause No. 43097, dated August 15, 2006, p. 14.

31. In justifying Duke's request to pass through all of its costs under the PPA to its customers, Duke's President testified that "[a]ssuming that the Commission finds that th[e] Wind PPA is reasonable and necessary . . . it is entirely reasonable for the costs of the Wind PPA to be recovered through rates, just as other product-incurred costs of providing electric utility service are [recovered]. Moreover, assurance of cost recovery over the [20-year] life of the contract is necessary because . . . Duke Energy Indiana will not have the option to terminate the contract mid-stream should the economics change." *Id.* at p. 16 (emphasis added).

32. In explaining how Duke proposed to allocate its costs under the Power Purchase Agreement to its electricity customers, Duke's President testified that the "wind resource [should] be treated as a 'must run' unit or 'take or pay' contract."[7] Rebuttal Testimony of Kay Pashos, IURC Cause No. 43097, dated September 28, 2006, p. 3 ("Pashos Rebuttal Testimony"). Consistent with the foregoing, Duke personnel testified that Duke intended to pass through to its

---

[7] "Must run" units produce power in all economic circumstances and are paid the prevailing market price.

customers not only the contract price payable to BCWF under the Power Purchase Agreement, but also any transmission or congestion-related costs Duke might incur when it delivered the power to MISO. On this point, John Swez, Duke's Manager for Regulated Real Time Operations, testified that Duke's customers would be charged not only the payments Duke owes to BCWF under the PPA, but also "all [MISO] revenue credits or charges associated with transmission or congestion." Direct Testimony of John Swez, IURC Cause No. 43097, dated August 15, 2006, p. 4. Similarly, Diana Douglas, Duke's Director of Revenue Requirements, testified that there should be "no different treatment for the transmission related costs or credits associated with this purchase from that associated with other power purchases. As such, the Midwest ISO congestion and loss charges and credits associated with this purchase will be included with all other native load congestion and loss credits in the [quarterly Fuel Adjustment Clause] calculation." Direct Testimony of Diana L. Douglas, IURC Cause No. 43097, dated August 15, 2006, p. 6 (emphasis added).

33. In considering Duke's Petition, the IURC also received testimony from the Indiana Office of Utility Consumer Counselor (the "OUCC"), which represents Indiana utility consumers' interests before state and federal regulators. Joan Soller, Director of the Electric Division of the OUCC, submitted testimony stating that the OUCC favored the IURC's approval of Duke's Power Purchase Agreement with BCWF, but suggesting that in light of the PPA's twenty-year term, the IURC should permit a re-evaluation of the PPA if future changes in MISO's market rules altered the economic impact of the arrangement. Direct Testimony of Joan M. Soller, IURC Cause No. 43097, dated September 15, 2006, pp. 2, 5. Duke opposed this proposal on the grounds that: (i) BCWF needed a firm commitment over the PPA's twenty-year term in order to obtain financing for the Wind Farm's construction; and (ii) Duke had no ability

to terminate the PPA based on changes in MISO's market rules. As stated in rebuttal testimony submitted by Duke's President:

> Duke Energy Indiana is seeking upfront and final determinations . . . that the costs associated with the agreement are recoverable over the entire term of the agreement. The reality of this project is that the developer, Benton County Wind Farm LLC, must have a long-term, firm commitment in place in order to obtain financing and actually develop the wind farm. As a result, . . . absent *force majeure* (or an "Emergency Condition"), the contract does not contain any broad regulatory or other "outs" for subsequent changes in circumstances, such as potential changes in Midwest ISO market rules. Accordingly, [Duke Energy Indiana] do[es] not believe it would be reasonable for the Commission to allow for review and modification of the prudence of the contract or the recoverability of its costs.

Pashos Rebuttal Testimony, pp. 4-5 (emphasis added).

**MISO's New DIR Rules**

34. MISO's market rules require sellers of power (known as "Market Participants") for conventional power plants (such as gas or coal-fired plants) to bid prices at which they are willing to supply electricity to the MISO marketplace. Bid prices are provided to MISO in advance. MISO utilizes those price bids in a proprietary, automated algorithm to achieve the lowest price for electricity without compromising system reliability requirements. Power plants that submit the lowest prices for electricity "clear" the market and are "dispatched" (i.e., selected and allowed to generate and deliver all of their power) by MISO; other plants are "dispatched down" (i.e., their output is curtailed).

35. Prior to March 2013, Market Participants for wind-powered generating plants were not required to submit bids into MISO's automated dispatch system. Rather, wind generators produced power when sufficient winds were available, and the Market Participants for those generators received or paid the LMPs at the location where the power entered the grid. It

is BCWF's understanding that [redacted]. Upon information and belief, negative LMPs at the Wind Farm's location have increased, in part because of congestion caused by additional wind generation facilities located near the Wind Farm that came online after 2008.

36. On March 1, 2013, MISO's new Dispatchable Intermittent Resource ("DIR") rules for wind resources went into effect. Under the new DIR rules, Market Participants for wind energy projects such as Duke submit offer prices for the power they want to sell, just as conventional generators do. If a Market Participant's offer price is too high, MISO's automated dispatch system will send a "dispatch down" signal curtailing the generator's output. Thus, the amount of power a Market Participant is able to deliver and sell into the MISO marketplace is determined by the price it is willing to accept, as evidenced by its offer price.

**Duke Exploits MISO's New DIR Rules To Curtail BCWF's Output When the Market Price of Power Becomes Negative**

37. Notwithstanding MISO's adoption of new DIR rules, the parties' obligations under the Power Purchase Agreement remain unchanged. BCWF is still obliged to sell its power to Duke, and Duke is still obliged to either accept the Wind Farm's output or, if it chooses to procure power elsewhere, compensate BCWF as required by the PPA. Unfortunately, however, Duke has decided to use MISO's new DIR rules as a tool for avoiding the market risks it agreed to accept in the PPA.

38. Before MISO implemented its new DIR rules, [redacted]

[redacted] Upon information and belief, Duke has, despite BCWF's repeated demands, [redacted] since March 1, 2013.[9] Worse still, Duke has refused to pay BCWF for the production lost because of Duke's own bidding. According to Duke, [redacted].

39. Duke's refusal to [redacted] or to compensate BCWF for generation lost due to Duke's bidding practices has proven disastrous for BCWF. The Wind Farm frequently has been curtailed by MISO since March 1, 2013. As a result, the Wind Farm has produced substantially less power than it is capable of producing, with a corresponding collapse of the Wind Farm's cash and tax revenues. BCWF estimates that it has lost at least $[redacted] due to Duke's new bidding practices.

40. Duke's actions since March 1, 2013 violate multiple provisions of the parties' agreements. Specifically:

---

[8] Duke can make sure the Wind Farm is not curtailed by various means, including but not limited to: (i) [redacted]; (ii) "self-scheduling" the Wind Farm, as a result of which Duke would pay whatever price for power clears MISO's markets; and (iii) through procurement of a priority right to run from MISO.

[9] For certain periods after March 1, 2013, Duke has for operational reasons allowed Vectren to submit bids to MISO on Duke's behalf. BCWF does not seek damages from Duke for any output lost during these periods.

a. Duke agreed in the PPA and JESOA that it would not "curtail or reduce" the Wind Farm's output. JESOA § 2.4; *see also* PPA § 6.3. But that is exactly what Duke has done through its bidding practices.

b. Duke agreed in the PPA that it would compensate BCWF whenever it determined not to "accept" the Wind Farm's power. PPA § 4.6(a). Since March 1, 2013, Duke has refused to accept power [redacted], but has also refused to compensate BCWF for the revenues BCWF has lost due to Duke's refusal.

c. Duke agreed in the Power Purchase Agreement that it would "reasonably cooperate" with BCWF on all "bidding and scheduling." PPA § 6.2. By refusing to [redacted], Duke is refusing to "cooperate" with BCWF, thereby causing the Wind Farm to be curtailed solely for economic reasons. [redacted], Duke's recent conduct is in no way "reasonable."

d. [redacted], Duke is effectively refusing to bear transmission and congestion related costs that Duke specifically agreed in the PPA and JESOA that it would pay. *See* PPA § 6.4; JESOA §§ 2.5, 3.2(a).

e. Finally, Duke agreed in the PPA that would act in "good faith" and deal fairly with BCWF. *See* PPA § 12.2(c). Duke's exploitation of MISO's new market rules to curtail the Wind Farm's output and thereby [redacted]

[redacted] constitutes a bad faith attempt by Duke to avoid its contractual obligations.

41. As explained above, BCWF relies entirely on revenues from its Power Purchase Agreements with Duke and Vectren to pay expenses, [redacted]. If Duke continues to curtail the Wind Farm's output without compensating BCWF, [redacted].[10]

## COUNT I
## BREACH OF CONTRACT

42. BCWF re-alleges paragraphs 1 through 41 as though each were fully set forth herein.

43. The Power Purchase Agreement and the JESOA are valid contractual agreements.

44. BCWF has fully performed all of its obligations under its agreements with Duke.

45. As set forth above, Duke has breached multiple provisions of the Power Purchase Agreement and the JESOA by: (i) curtailing the Wind Farm's output in an attempt to avoid costs Duke is obliged to pay when reselling the Wind Farm's power to MISO; and (ii) refusing to compensate BCWF for damages BCWF has sustained due to Duke's refusal to accept BCWF's power.

46. Duke has also breached its implied duty not to hinder BCWF's performance of its contractual obligations. As a result, Duke's breach of its obligations under the PPA and JESOA cannot be excused by any alleged failure of BCWF to perform its obligations under those agreements.

---

10 [redacted]

47. As a result of Duke's breach of its contractual obligations, BCWF has been damaged in an amount to be determined at trial, but not less than $[redacted].

**COUNT II**
**BREACH OF IMPLIED PROMISE NOT TO HINDER PERFORMANCE**

48. BCWF re-alleges paragraphs 1 through 47 as though each were fully set forth herein.

49. Under Indiana law, Duke has an implied duty not to hinder BCWF's performance under the Power Purchase Agreement and the JESOA.

50. [redacted], Duke has hindered BCWF from delivering power it could have generated absent Duke's conduct. Duke's hindrance of BCWF, combined with Duke's refusal to pay for power it refuses to accept, has caused a substantial reduction in BCWF's revenues, which all parties knew were necessary to sustain BCWF's business.

51. As a result of Duke's breach of its duties, BCWF has been damaged in an amount to be determined at trial, but not less than $[redacted].

**COUNT III**
**BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING**

52. BCWF re-alleges paragraphs 1 through 51 as though each were fully set forth herein.

53. The Power Purchase Agreement provides that its interpretation and enforceability shall be governed by "concepts of materiality, reasonableness, good faith, and fair dealing." PPA § 12.2(c).

54. [redacted] compensate BCWF for power it has refused to accept, Duke has violated its contractual duty of good faith and fair dealing. [redacted] as an excuse not to pay BCWF the compensation negotiated under the Power Purchase Agreement and that Duke paid prior to March 1, 2013.

55. As a result of Duke's breach of its duties, BCWF has been damaged in an amount to be determined at trial, but not less than $[redacted].

**COUNT IV**
**DECLARATORY JUDGMENT**

56. BCWF re-alleges paragraphs 1 through 55 as through each were fully set forth herein.

57. Duke has refused to comply with its obligations under the Power Purchase Agreement and the JESOA. As a result, an actual controversy now exists between BCWF and Duke regarding the scope of Duke's obligations under the parties' contractual agreements.

58. Pursuant to 28 U.S.C. § 2201, this Court is empowered to render a declaratory judgment as to the parties' respective rights and obligations under the Power Purchase Agreement and JESOA.

59. BCWF is entitled to a declaration that Duke's conduct violates its obligations under the Power Purchase Agreement and the JESOA, and that Duke has an affirmative obligation to: (i) submit bids ([redacted]) in a manner that ensures BCWF will be able to run at full capacity (absent an Emergency Condition or Force Majeure Event) whenever possible; or (ii) in accordance with Section 4.6 of the Power Purchase

Agreement, pay BCWF for power and PTCs BCWF is not able to generate due to Duke's refusal to accept power from BCWF.

**PRAYER FOR RELIEF**

WHEREFORE, BCWF respectfully requests that this Court order as follows:

A. For Counts I, II, and III, compensatory damages in an amount to be determined at trial, but not less than $[redacted];

B. For Count IV, an Order declaring that Duke's conduct violates its obligations under the Power Purchase Agreement and the JESOA;

C. An award of costs and expenses incurred in connection with this action; and

[*Text Continues on Following Page*]

D. Such other and further relief as this Court may deem just and proper.

Dated: December 16 2013
Indianapolis, IN

Respectfully submitted,

HOOVER HULL LLP

By: [signature]
Andrew W. Hull (#11218-49)
Laurie E. Martin (#26877-49)

111 Monument Circle, Suite 4400
P.O. Box 44989
Indianapolis, IN 46244-0989
Telephone: (317) 822-4400
Facsimile: (317) 822-0234
Email: awhull@hooverhull.com
lmartin@hooverhull.com

-and-

Clay J. Pierce (motion for *pro hac vice* admission to be filed)
DRINKER BIDDLE & REATH LLP
1177 Avenue of the Americas, 41st Floor
New York, NY 10036
Telephone: (212) 248-3140
Facsimile: (212) 248-3141
Email: clay.pierce@dbr.com

*Attorneys for Plaintiff*
*Benton County Wind Farm LLC*

673261