# EXHIBIT A

EXECUTION COPY

# RENEWABLE WIND ENERGY PROJECT

# PURCHASE POWER AGREEMENT

**BETWEEN**

**PSI ENERGY, INC. d/b/a DUKE ENERGY INDIANA, INC.,**

**as Buyer,**

**AND**

**BENTON COUNTY WIND FARM LLC,**

**as Seller**

**dated September 1, 2006**

# TABLE OF CONTENTS

Page


ARTICLE 1 DEFINITIONS .......... 1

ARTICLE 2 TERM, FINANCIAL CLOSING, COMMENCEMENT OF OPERATION, AND CREDIT SUPPORT .......... 7

2.1 TERM .......... 7
2.2 DESIGNATED START DATE .......... 8
2.3 COMMENCEMENT OF OPERATION .......... 8
2.4 PAYMENTS FOR DELAYED COMMERCIAL OPERATION. .......... 8
2.5 CREDIT SUPPORT .......... 8

ARTICLE 3 EARLY TERMINATION RIGHTS .......... 9

3.1 EARLY TERMINATION RIGHTS OF SELLER BEFORE COMMERCIAL OPERATION DATE .......... 9
3.2 EARLY TERMINATION RIGHTS OF BUYER BEFORE COMMERCIAL OPERATION DATE .......... 10
3.3 OTHER TERMINATION RIGHTS .......... 10
3.4 RETURN OF SECURITY .......... 11

ARTICLE 4 SALE AND PURCHASE COMMITMENTS; PAYMENT .......... 11

4.1 SALE AND PURCHASE OF ENERGY AND CREDITS .......... 11
4.2 DESIGNATED NAME PLATE CAPACITY RATING .......... 11
4.3 SALES TO THIRD PARTIES/[redacted] .......... 12
4.4 PAYMENT .......... 12
4.5 MEASUREMENT OF ELECTRICITY .......... 12

ARTICLE 5 OPERATION AND MAINTENANCE OF THE FACILITY .......... 14

5.1 SELLER'S CORE OBLIGATION .......... 14
5.2 SELLER'S CHOICE OF OPERATOR .......... 14
5.3 ACCESS AND INFORMATION .......... 14
5.4 PERMITS; COMPLIANCE WITH LAWS .......... 15
5.5 OPERATING PROCEDURES .......... 15

ARTICLE 6 SCHEDULING, DELIVERY AND TRANSMISSION .......... 16

6.1 SELLER'S DELIVERY-RELATED NOTICE OBLIGATIONS .......... 16
6.2 SCHEDULING/MARKET PARTICIPANT .......... 16
6.3 ENVIRONMENTAL QUALITY CERTIFICATION REQUIREMENTS .......... 16
6.4 TRANSMISSION. .......... 16

ARTICLE 7 INTERCONNECTION .......... 17

7.1 INTERCONNECTION FACILITIES .......... 17
7.2 POINT OF METERING .......... 17
7.3 TITLE; RISK OF LOSS; EXCLUSIVE CONTROL .......... 17
7.4 INTERCONNECTION AGREEMENT .......... 17
7.5 STATION SERVICE POWER – RETAIL .......... 18

ARTICLE 8 METERING .......... 18

8.1 METER REQUIREMENTS .......... 18
8.2 INSPECTION AND TESTING OF THE METERS .......... 18

ARTICLE 9 COMMISSIONING AND TESTING .......... 19

9.1 SELLER'S NOTICE AND TESTING OBLIGATION ..... 19
9.2 TEST ENERGY ..... 19

ARTICLE 10 BILLING AND PAYMENT ..... 19

10.1 BILLING ..... 19
10.2 PAYMENT ..... 19

ARTICLE 11 TAXES, FEES, AND TAX CREDITS ..... 20

ARTICLE 12 REPRESENTATIONS AND WARRANTIES ..... 21

12.1 REPRESENTATIONS AND WARRANTIES OF SELLER ..... 21
12.2 REPRESENTATIONS AND WARRANTIES OF BUYER ..... 22

ARTICLE 14 FORCE MAJEURE EVENT ..... 23

14.1 FORCE MAJEURE EVENT DEFINED ..... 23
14.2 APPLICABILITY OF FORCE MAJEURE EVENT ..... 24

ARTICLE 15 TERMINATION AND DEFAULT ..... 24

15.1 EVENT OF DEFAULT ..... 24
15.2 REMEDIES FOR DEFAULT ..... 27
15.3 INJUNCTIVE RELIEF ..... 27
15.4 DAMAGES PAYABLE IN THE EVENT OF TERMINATION. ..... 27

ARTICLE 16 INDEMNIFICATION AND LIABILITY ..... 29

16.1 INDEMNIFICATION ..... 29
16.2 FINES ..... 29
16.3 LIMITATIONS OF LIABILITY, REMEDIES AND DAMAGES ..... 30

ARTICLE 17 GENERAL ..... 31

17.1 ASSIGNMENT ..... 31
17.2 CONFIDENTIALITY ..... 33
17.3 PUBLICITY ..... 33
17.4 NAMING RIGHTS ..... 34
17.5 SEVERAL OBLIGATIONS ..... 34
17.6 NOTICES ..... 34
17.7 CAPTIONS ..... 35
17.8 GOVERNING LAW/VENUE ..... 35
17.9 DISPUTE RESOLUTION ..... 35
17.10 NO RESIDUAL VALUE ..... 37
17.11 NO THIRD PARTY BENEFICIARY ..... 37
17.12 ENTIRE AGREEMENT; MODIFICATION AND WAIVER; SEVERABILITY ..... 37
17.13 FINANCING LIENS. ..... 37

EXHIBIT A – Purchase Price

EXHIBIT B – Form of Payment Guaranty

## RENEWABLE WIND ENERGY PROJECT

## PURCHASE POWER AGREEMENT

THIS RENEWABLE WIND ENERGY PROJECT PURCHASE POWER AGREEMENT is entered into on this 1st day of September, 2006, by and between Benton County Wind Farm LLC, a Delaware limited liability company ("**Seller**"), and PSI Energy, Inc. d/b/a Duke Energy Indiana, Inc., an Indiana corporation ("**Buyer**"). Buyer and Seller are sometimes referred to in this Agreement individually as a "**Party**" and collectively as the "**Parties.**"

### WITNESSETH

WHEREAS, Buyer desires to purchase (a) electric energy from a renewable source, and (b) the Credits associated with, and to the extent available from, the generation of such electric energy; and

WHEREAS, Seller will construct and own, operate and maintain, or arrange for the operation and maintenance of, a wind-powered electric generating plant with a nameplate capacity of approximately 100 megawatts (the "**Plant**"), to be located at a site in Benton County, Indiana,

NOW THEREFORE, in consideration of these premises and the mutual promises set forth below, Seller and Buyer agree as follows:

### ARTICLE 1
### DEFINITIONS

**Abandonment**: Means any voluntary cessation prior to the Commercial Operation Date by Seller of all or substantially all construction activities of the Plant for a period of more than thirty (30) consecutive days, which is not a result of a Force Majeure Event, together with the intention of Seller not to resume such construction activities.

**Agreement**: Means this Renewable Wind Energy Project Purchase Power Agreement entered into between Seller and Buyer, as amended by the Parties from time to time.

**Alternate:** Has the meaning assigned to such term in Section 5.5.

**Affiliate**: Means, when used with reference to a specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with the specified Person. For purposes of the foregoing, "**control,**" "**controlled**" and "**under common control**" with respect to any Person means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person or entity, whether through the ownership of voting securities, partnership interests or other ownership interests, by contract or otherwise.

**After-Tax Basis:** Means the then-current amount of the PTC applicable to the Electrical Output, with reasonable adjustment for expected inflation during the relevant projection period, if applicable (the "**Base Payment**"), supplemented by a further payment (the "**Additional Payment**") to such Person so that the sum of the Base Payment plus the Additional Payment shall, after deduction of the amount of all taxes required to be paid by such Person in respect of the receipt or accrual of the Base Payment and the Additional Payment (taking into account any current or previous credits or deductions arising from the underlying event giving rise to the payment, the Base Payment and the Additional Payment), be equal to the amount required to be received. Such calculations shall be made on the assumption that the recipient is subject to Federal income taxation at the highest applicable statutory rate applicable to corporations for the relevant period or periods, is subject to state and local income taxation at the highest applicable statutory rates applicable to corporations doing business in Indianapolis, Indiana, and shall take into account the deductibility (for Federal income tax purposes) of state and local income taxes.

**Appraiser**: Means an individual with experience in the independent power generation and/or power marketing industry who is not affiliated with, and does not have any financial interest in, either Party.

**Authorized Representative**: Has the meaning assigned to such term in Section 5.5.

**Average Annual Net Output**: Means the product of 3,066 MWh per MW, *multiplied by* the Designated Name Plate Capacity Rating.

**Business Day**: Means any day that banks are open for business in New York, New York.

**Buyer**: Has the meaning assigned to such term in the preamble to this Agreement.

**Buyer Conditions**: Means the conditions listed in Section 3.2.

**Capacity Rights:** Means the rights associated with the capacity of the Plant.

**Claims**: Means any claims, judgments, losses, liabilities, costs, expenses (including reasonable attorneys' fees) and damages of any nature whatsoever (except workers' compensation claims) in relation to personal injury, death or property damage incurred or made by third parties.

**Commercial Operation**: Means, with respect to any wind turbine, that (i) such wind turbine is able to generate electricity, (ii) such wind turbine has been tested and accepted by Seller, and (iii) all necessary facilities identified in the Interconnection Agreement have been completed to allow regular operation of such wind turbine.

**Commercial Operation Date**: Means the date designated by Seller as the first date that the Plant is able to generate electricity, which date will be no earlier than the Day following the Day on which Commercial Operation for the installed wind turbines that are capable of producing at least 80% of the Designated Name Plate Capacity Rating has been achieved.

**Commercial Operation Shortfall Percentage**: Means, as of any Day, a fraction, the numerator of which is equal to the number of megawatts of the wind turbines comprising the Plant that have not achieved Commercial Operation, and the denominator which is the Designated Name Plate Capacity Rating.

**Commercially Reasonable** or **Commercially Reasonable Efforts**: Means, with respect to any action required to be made, attempted or taken by a Party under this Agreement, the level of effort in light of the facts known to such Party at the time a decision is made that: (i) can reasonably be expected to accomplish the desired action at a reasonable cost; (ii) is consistent with Prudent Industry Practices; and (iii) takes into consideration the amount of advance notice required to take such action, the duration and type of action and the competitive environment in which such action occurs.

**Contest**: Means, with respect to any Person, a contest of (a) any Governmental Approval or any act or omission by Government Agencies, or (b) the amount or validity of any claim pursued by or against such Person in good faith and by appropriate legal, administrative or other proceedings diligently conducted so long as: (i) appropriate notations are included in the Parties' financial statements regarding possible liabilities in accordance with Generally Accepted Accounting Principles, (ii) neither Party could reasonably be expected to incur criminal or civil liability with respect thereto for which adequate indemnification or compensation therefor is not available and (iii) during the period of such contest the enforcement of such claim is effectively stayed.

**Credit Support**: Means a guarantee, letter of credit, cash deposited into an escrow established for the benefit of the other Party, or other form of security that is provided pursuant to Section 2.5.

**Credits**: Means any type of emission credits, offsets, credit certificates or similar items such as those for emission reductions, greenhouse gas reduction, or the generation of green power or renewable energy, created by any Government Agency and/or independent certification board or group or created pursuant to private bilateral contracts, in each case generally recognized in the electric power generation industry, and generated by or associated with the Plant, but specifically excluding any and all production tax credits or PTCs, investment tax credits, property tax credits, and any other tax credits, as granted by Government Agencies, which are or will be generated by or associated with the Plant.

**Day**: Means the 24-hour period beginning and ending at 12:00 midnight in the time zone in which the Plant is located.

**Delay Damages**: Means the product of (i) the Average Annual Net Output, *multiplied by* (ii) seventy-five percent (75%), *multiplied by* (iii) [redacted] Dollars ($[redacted]) per MWh, *divided by* (iv) 365 days in a calendar year.

**Delivery Excuse**: Means any of the following, at any time during the Term: (i) any Event of Default of Buyer (as defined in Section 15.1(b)) under this Agreement; (ii) any delay or failure by Buyer in giving any approval, or deciding whether to give any approval, within the

times required under this Agreement that is not the result of a Force Majeure Event affecting the performance of the Buyer; (iii) any delay or failure by Buyer in performing any obligation under this Agreement that is not the result of a Force Majeure Event affecting the performance of the Buyer, and (iv) any failure of Buyer to have adequate Transmission Service (whether due to Transmission Service curtailments or interruptions, Force Majeure Event, the unavailability of Transmission Service or otherwise, unless due to an Emergency Condition) to take delivery of the Electric Output at the Point of Metering.

**Designated Name Plate Capacity Rating**: Has the meaning assigned to such term in Section 4.2.

**Designated Start Date**: Has the meaning assigned to such term in Section 2.2.

**Effective Date**: Means the date of execution and delivery of this Agreement by Seller and Buyer.

**Electrical Output**: Means the entire electric energy output of the Plant delivered to the Point of Metering, as measured pursuant to Article 8.

**Emergency Condition**: Means (i) a condition or situation that presents an imminent physical threat of danger to life, health or property, (ii) an abnormal system condition requiring manual or automatic action to maintain system frequency, or to prevent loss of firm load, equipment damage, or tripping of system elements that could adversely affect the reliability of any electric system or the safety of persons or property, (iii) a fuel shortage requiring departure from normal operating procedures in order to minimize the use of such scarce fuel, (iv) a condition that requires implementation of Emergency procedures as defined in the RTO Requirements, or (v) a condition where either the RTO or NIPSCO order a reduced or curtailed output for reliability purposes in accordance with the Interconnection Agreement.

**Event of Default**: Has the meaning assigned to such term in Section 15.1(a) and Section 15.1(b).

**Financing Documents**: Means any document relating to the financing or refinancing of the acquisition, development, construction, ownership, operation, maintenance or leasing of the Plant.

**Financing Parties**: Means institutions (including any trustee or agent on behalf of such institutions) providing debt or equity financing or refinancing to Seller for the acquisition, development, construction, ownership, operation, maintenance or leasing of the Plant.

**Force Majeure Event**: Has the meaning assigned to such term in Section 14.1.

**Forced Outage**: Means an unplanned component failure, transmission system failure, or other condition that requires all or a portion of the Plant, the Plant substation, or the Interconnection Facilities to be promptly removed from service.

**Government Agency**: Means any federal, state, local, territorial, tribal or municipal government and any department, commission, board, bureau, agency, instrumentality, judicial or administrative body thereof having jurisdiction over the Plant, Buyer or Seller, as the case may be.

**Governmental Approval**: Means any authorization, consent, approval, license, ruling, permit, exemption, variance, order, judgment, decree, declarations of or regulation by any Government Agency relating to the acquisition, development, ownership, leasing, occupation, construction, start-up, testing, operation or maintenance of the Plant or to the execution, delivery or performance of this Agreement.

**Interconnection Agreement**: Means the interconnection agreement into which Seller or an Affiliate of Seller must enter with NIPSCO and/or RTO, as more fully described in Article 7.

**Interconnection Facilities**: Means all the facilities installed for the purpose of interconnecting the Plant to the Plant substation, including, but not limited to all transformers and associated equipment, relay and switching equipment, and safety equipment, and including, the Point of Metering, necessary to interconnect with NIPSCO and/or the RTO for delivery.

**Investment Grade**: Means a rating of at least BBB- by S&P or Baa3 by Moody's.

**IURC**: Means the Indiana Utility Regulatory Commission or any successor organization.

**IURC Order**: Means a final non-appealable Order issued by the IURC that permanently authorizes Buyer to recover payments to be made under this Agreement from Buyer's retail customers.

**Law**: Means any statute, law, rule or regulation or any judicial or administrative interpretation thereof having the effect of the foregoing imposed by a Government Agency, whether in effect now or at any time in the future.

**Letter of Credit**: Means an irrevocable standby letter of credit, issued by a financial institution acceptable to Buyer or Seller, as the case may be, on terms reasonably acceptable to Buyer or Seller, as the case may be. For purposes of this definition, an institution shall be deemed acceptable to both Parties if it has (i) a capital surplus of at least One Hundred Million Dollars ($100,000,000), *and* (ii) a rating for its long-term unsecured senior debt (or, if such debt is not rated, a corporate rating) that is at least Investment Grade.

**Liquidated Damages**: Has the meaning assigned to such term in Section 2.4.

**Locational Marginal Price (LMP)**: Means the market clearing price at a specific Commercial Pricing Node (CPNode) in the Midwest Market that is equal to the cost of supplying the next increment of load at that location. LMP values have three components for settlement purposes: marginal energy component, marginal congestion component, and marginal loss component. The value of an LMP is the same whether a purchase or sale is made at that node.

**Meters**: Has the meaning assigned to such term in Section 8.1.

**Month**: Means a calendar month.

**Moody's**: Means Moody's Investor's Service.

**MW**: Means a megawatt.

**MWh**: Means a megawatt-hour.

**Name Plate Capacity Rating**: Means the aggregate sum, expressed in MWs, of the manufacturer's rated electric energy output of each of the generating units comprising the Plant.

**NIPSCO**: Means Northern Indiana Public Service Company, a combined electric and gas utility owned by NiSource Inc.

**Operating Procedures**: Has the meaning assigned to such term in Section 5.5.

**Party**: Has the meaning assigned to such term in the preamble to this Agreement.

**Person**: Means any individual, corporation, partnership, limited liability company, joint venture, trust, unincorporated organization or Government Agency or any business entity whose existence may be authorized by a Government Agency.

**Plant**: Means the Seller's wind turbines, supervisory control and data acquisition system, and other facilities and equipment located in Benton County, Indiana.

**Point of Metering**: Means the interconnection point with NIPSCO and/or RTO, which is more fully described in the Interconnection Agreement.

**Press Release**: Has the meaning assigned to such term in Section 17.3.

**Prime Rate**: Has the meaning assigned to such term in Section 10.2(b).

**Prudent Industry Practice**: Means any of the practices, methods, standards and acts (including, but not limited to, the practices, methods and acts engaged in or approved by a significant portion of the wind power generation industry in the United States, particularly as regards the installation, operation, and maintenance of wind turbines and related facilities) that, at a particular time, in the exercise of reasonable judgment in light of the facts known or that should have reasonably been known at the time a decision was made, could have been expected to accomplish the desired result consistent with good business practices, reliability, economy, safety and expedition, and applicable Governmental Approvals and Law.

**PTC**: Means the renewable electricity production credit described in Title 26, Subtitle A, CHAPTER 1, Subchapter A, PART IV, Subpart D, Section 45 of the Internal Revenue Code of 1986, as amended.

**RTO**: Means the Midwest Independent Transmission System Operator, Inc., a Regional Transmission Organization based in Carmel, Indiana, or its successor organization, which is approved by the Federal Energy Regulatory Commission.

**RTO Requirements**: Means all RTO agreements, all tariffs, operational manuals, rules and regulations established by the RTO, and the normal business practices, as they may be amended and modified from time to time, of the RTO.

**S&P**: Means Standard & Poor's Rating Group.

**Seller**: Has the meaning assigned to such term in the preamble to this Agreement.

**Seller Conditions**. Means the conditions listed in Section 3.1.

**Station Service Power – Retail**: Means electric energy used to operate the Plant other than such electric energy generated by the Plant, whether the Plant is generating electric energy or not.

**Taxes**: Has the meaning assigned to such term in Article 11.

**Term**: Has the meaning assigned to such term in Section 2.1.

**Transmission Services**: Means all transmission or wheeling services, scheduling services, imbalance services, OASIS, congestion and congestion management services, tagging services, dispatch services, ancillary services, control area services, and other transmission services necessary for Buyer to accept Electrical Output at the Point of Metering and transmit, and deliver Electrical Output from the Point of Metering, using the highest priority transmission service available.

## ARTICLE 2
## TERM, FINANCIAL CLOSING, COMMENCEMENT OF OPERATION, AND CREDIT SUPPORT

2.1 Term

This Agreement will become effective as of the Effective Date and will continue in effect for a period ending on the date that is twenty (20) years following the last Day of the Month during which the Commercial Operation Date occurs (the "**Term**"), unless otherwise extended or terminated in accordance with the provisions of this Agreement. To the extent that, after the Commercial Operation Date, Seller is prevented or delayed in delivering Electrical Output by a Force Majeure Event in accordance with Section 14.1, then the Term will be extended by the period of such Force Majeure Event, on a Day-for-Day basis for each Day on which a Force Majeure Event continues for more than eight hours, *provided* that such extensions of the Term shall not exceed, in the aggregate, twelve (12) months.

2.2 Designated Start Date

The "**Designated Start Date**" will be no later than December 31, 2007 (as such date may be extended on a Day-for-Day basis for any delay in achieving the Commercial Operation Date that results from (a) a Force Majeure Event affecting Seller and/or Buyer, (b) a Delivery Excuse or (c) an Emergency Condition).

2.3 Commencement of Operation

The respective rights and obligations of Buyer and Seller relating to the commercial operation of the Plant will commence on the Commercial Operation Date.

2.4 Payments for Delayed Commercial Operation.

If the Commercial Operation Date has not occurred by the Designated Start Date, upon notice from Buyer, Seller will pay to Buyer an amount equal to (a) the Delay Damages, multiplied by (b) the Commercial Operation Shortfall Percentage, calculated on a Day-by-Day basis, as liquidated damages (and not as a penalty) for each Day (i) for which the Commercial Operation Date is delayed beyond the Designated Start Date and (ii) that is not a Day on which the Commercial Operation Date has been delayed because of a Force Majeure Event affecting Seller and/or Buyer, a Delivery Excuse or an Emergency Condition.

All such amounts will be paid by Seller on the 10th Day of the Month following the Month containing the Day such amount accrued. The aggregate amount payable by Seller pursuant to this Section 2.4 for liquidated damages (such aggregate amount, "**Liquidated Damages**") will not exceed $[redacted] per MW of the Designated Name Plate Capacity Rating.

2.5 Credit Support

(a) Seller's Credit Support Related to Commercial Operation. Seller will provide Buyer with the following and for the following periods:

No later than thirty (30) Days after all of the Seller Conditions are satisfied, Seller shall establish Credit Support in the form of either: (1) a Letter of Credit to pay Liquidated Damages, (2) an unconditional payment guarantee of Seller's obligation to pay Liquidated Damages in the form attached hereto as Exhibit B, from a guarantor that has a rating on its long-term senior unsecured debt that is at least Investment Grade (or has an Investment Grade corporate issuer rating if such long-term senior unsecured debt is not rated), (3) cash deposited into an escrow established for the benefit of Buyer, in form and substance reasonably satisfactory to Buyer, to support Seller's obligations to pay Liquidated Damages, or (4) other Credit Support acceptable to Buyer in its sole discretion. Seller's Credit Support shall be in the amount of the Liquidated Damages (less any amounts drawn thereunder, withdrawn therefrom or paid thereunder to Buyer) and shall be effective through the earlier of (i) the date which is one year from the

effective date of such Credit Support, and (ii) the 45th Day succeeding the Commercial Operation Date. Such Credit Support shall provide that it may be drawn by Buyer after the Designated Start Date only if Seller has failed to pay to Buyer the liquidated damages due and owing pursuant to the terms and conditions of Section 2.4.

(b) Seller's Ongoing Credit Support. After the Commercial Operation Date, if reasonable grounds for insecurity arise with respect to the performance by Seller of its obligations under this Agreement, Buyer may in writing request adequate assurance of due performance by Seller. Seller may satisfy such request for adequate assurance by providing Credit Support in an amount determined in a commercially reasonable manner (but not more than $5,000,000 in the aggregate during the Term, less any amounts drawn thereunder), and in a form reasonably acceptable to Buyer except that a payment guarantee shall be in the form attached hereto as Exhibit B. In the context of this paragraph, Buyer shall be considered to be the "Requesting Party" and Seller shall be considered to be the "Providing Party".

(c) Buyer's Credit Support. On an ongoing basis during the Term of this Agreement, if reasonable grounds for insecurity arise with respect to the performance by Buyer of its obligations under this Agreement, Seller may in writing request adequate assurance of due performance by Buyer. Buyer may satisfy such request for adequate assurance by providing Credit Support in an amount determined in a commercially reasonable manner (but not more than $5,000,000 in the aggregate during the Term, less any amounts drawn thereunder), and in a form reasonably acceptable to Seller. In the context of this paragraph, Seller shall be considered to be the "Requesting Party" and Buyer shall be considered to be the "Providing Party".

(d) Request for Credit Support. Upon receipt of a reasonable request for adequate assurance of due performance, the Providing Party shall have ten (10) Business Days to provide adequate assurance of due performance in the form of Credit Support before an Event of Default under Section 15.1 will be deemed to have occurred and the Requesting Party will be entitled to the remedies set forth in Section 15.2 of this Agreement. If the Providing Party provides Credit Support to the Requesting Party within fifteen (15) Business Days, it is understood that the Providing Party shall not in fact have defaulted under this Agreement. Provision of Credit Support by the Providing Party shall not be deemed an admission that reasonable grounds for insecurity existed with respect to performance, and the Providing Party reserves the right to dispute whether such reasonable grounds existed.

## ARTICLE 3
## EARLY TERMINATION RIGHTS

3.1 Early Termination Rights of Seller before Commercial Operation Date

Provided no Event of Default with respect to Seller is then continuing, Seller may terminate this Agreement without further obligation to Buyer by delivering written notice

to Buyer not later than July 31, 2007, in the event the Seller Conditions listed below are not satisfied by December 31, 2006:

(a) Buyer certifies to Seller that the IURC has issued a final non-appealable Order, acceptable to Buyer, that permanently authorizes Buyer to recover payments to be made under this Agreement from Buyer's retail customers.

(b) Execution and delivery of the Interconnection Agreement by all of the parties thereto, in a form reasonably acceptable to Seller.

(c) The IURC issues a final non-appealable Order, acceptable to Seller, that declares that it declines to exercise any jurisdiction over Seller's construction, ownership and operation of, and other activities in connection with, the Plant.

Seller shall use Commercially Reasonable Efforts to satisfy the Seller Conditions listed in clauses (b) and (c) above by no later than December 31, 2006.

3.2 Early Termination Rights of Buyer before Commercial Operation Date

Provided no Event of Default with respect to Buyer is then continuing, Buyer may terminate this Agreement without further obligation to Seller by delivering written notice to Seller not later than July 31, 2007, in the event the Buyer Conditions listed below are not satisfied by June 30, 2007:

(a) The IURC issues a final non-appealable Order, acceptable to Buyer, that permanently authorizes Buyer to recover payments to be made under this Agreement from Buyer's retail customers.

(b) Execution and delivery of the Interconnection Agreement by all of the parties thereto, in a form reasonably acceptable to Buyer.

Buyer shall use Commercially Reasonable Efforts to satisfy the Buyer Conditions by no later than December 31, 2006. Buyer shall certify to Seller, within thirty (30) days of issuance of an Order by the IURC that permanently authorizes Buyer to recover payments to be made under this Agreement from Buyer's retail customers, whether such Order is acceptable to Buyer.

3.3 Other Termination Rights

(a) If any Force Majeure Event claimed by a Party continues for an uninterrupted period of more than 18 Months from the date of notice provided by such Party in accordance with Section 14.2(a), then, unless Seller is applying insurance proceeds to the repair of the Plant, the other Party may, at any time following the end of such period, provided such Force Majeure Event is then continuing, terminate this Agreement immediately upon written notice to the affected Party, without further obligation by the terminating Party, except as to payment of any costs and liabilities incurred before the effective date

of such termination; provided, such notice of termination must be given during the period that performance continues to be delayed or prevented by the Force Majeure Event.

(b) A Party may terminate this Agreement in accordance with Article 15.

(c) If the Commercial Operation Date is delayed beyond the Designated Start Date for a period of more than 12 months for reasons other than a Force Majeure Event affecting Seller and/or Buyer or an Emergency Condition, then either Party may, within 90 days following the end of such period, terminate this Agreement immediately upon written notice to the other Party, without further obligation by either Party except as to payment of Liquidated Damages pursuant to Section 2.4 (which shall be Seller's only obligation) or any costs and liabilities incurred before the effective date of such termination (which shall be Buyer's only obligation).

3.4 Return of Security

Upon the effectiveness of any termination of this Agreement by Seller or Buyer without further liability hereunder in accordance with this Article 3, any Credit Support provided by Seller or Buyer pursuant to Section 2.5 shall be promptly returned to such Party by the other Party.

## ARTICLE 4
## SALE AND PURCHASE COMMITMENTS; PAYMENT

4.1 Sale and Purchase of Energy and Credits

During the term of this Agreement, Seller shall deliver and sell to Buyer and Buyer shall accept and purchase from Seller (a) Electrical Output of the Plant; and (b) any Credits associated with, and to the extent available from, such Electrical Output purchased by Buyer. After the Commercial Operation Date, the Capacity Rights shall belong to Buyer, *provided* that Seller makes no representation or warranty whatsoever regarding the quantity of capacity associated with the Plant or any rights associated therewith.

4.2 Designated Name Plate Capacity Rating

Seller shall designate the Name Plate Capacity Rating of the Plant (the "**Designated Name Plate Capacity Rating**") by delivering written notice to Buyer no later than June 30, 2007 (as such date may be extended on a Day-for-Day basis for any delay that results from (a) a Force Majeure Event affecting Seller, or (b) any Seller Condition not being satisfied on or before December 31, 2006). The Designated Name Plate Capacity Rating shall not be less than approximately 99 MW or greater than approximately 101 MW. Within 30 days of the Commercial Operation Date, Buyer shall provide Seller with a site plan that identifies the locations of the wind turbines that comprise the Plant.

4.3 Sales to Third Parties/[redacted]

(a) So long as no Event of Default has occurred and is continuing with respect to Buyer and except as set forth in Section 4.6 and 9.2, Seller will not have the right to sell to third parties any of the Electrical Output of the Plant and any of the Credits associated with the Plant.

[redacted]

4.4 Payment.

Buyer will pay Seller for the Electrical Output and Credits at a price per MWh of Electrical Output delivered to Buyer at the Point of Metering in accordance with Exhibit A attached hereto.

4.5 Measurement of Electricity

All Electrical Output will be measured at the Point of Metering and will meet the specifications established by the Interconnection Agreement, as the same may be amended from time to time. For purposes of monthly billing in accordance with Article 10, NIPSCO and/or the RTO will ensure that the Meters are read at the end of each Month.

4.6 Buyer's Failure to Accept Delivery of Electrical Output.

(a) In the event that Buyer fails to accept delivery of all of the Electrical Output at the Point of Metering, whether due to Buyer's failure to obtain Transmission Service (if

applicable) or for any reason other than Seller's failure to perform, an Emergency Condition, a Force Majeure Event that prevents such acceptance pursuant to Article 14 or the proper exercise by Buyer of its suspension rights pursuant to Section 15.2(a), then Buyer shall pay to Seller as liquidated damages an amount equal to the positive difference, if any, between (i) (x) the amount that would have been payable by Buyer to Seller hereunder if such Electrical Output had been accepted by Buyer plus (y) additional transmission charges, if any, reasonably incurred by Seller in delivering the Electrical Output to such third party purchaser and (ii) the net amount, if any, that Seller, using Commercially Reasonable Efforts, actually realizes through remarketing of such Electrical Output to Persons other than Buyer, *provided* that in the event Seller is unable to remarket such Electrical Output, then the net amount described in clause (ii) shall be $0 and the damages owed by Buyer shall also include the then-current amount of the PTC (on a per MWh basis) on an After-Tax Basis for each MWh of such Electrical Output that Seller was unable to remarket. The damages provided in this Section 4.6 shall be the sole and exclusive remedy of Seller for any failure of Buyer to accept delivery of Electrical Output that it is required to accept hereunder.

(b) Seller shall include in a monthly invoice delivered to Buyer pursuant to Section 10.1 the amounts owed by Buyer pursuant to Section 4.6(a) and a description, in reasonable detail, of the calculation of damages resulting from Buyer's failure to accept delivery of Electrical Output.

4.7 Seller's Failure to Deliver Electrical Output.

(a) In the event that Seller fails to deliver Electrical Output (less line losses) to the Point of Metering for any reason other than Buyer's failure to perform, an Emergency Condition, a Delivery Excuse, a Forced Outage, a Force Majeure Event that prevents delivery to Buyer pursuant to Article 14 or the proper exercise by Seller of its suspension rights pursuant to Section 15.2(a), then Seller shall pay to Buyer as liquidated damages an amount equal to the positive difference, if any, between (i)(x) the amount, if any, that Buyer, using Commercially Reasonable Efforts, actually pays for replacement electric energy or absent a purchase the market price at the Point of Metering for such electric energy not delivered as determined by Buyer in a commercially reasonable manner plus (y) additional transmission charges, if any, reasonably incurred by Buyer in purchasing such replacement electric energy and (ii) the amount that would have been payable by Buyer to Seller hereunder if such Electrical Output had been delivered by Seller, *provided* that in the event Buyer is unable to purchase replacement electric energy that includes Credits, then the net amount described in clause (ii) shall also include the then-current amount of the Credit (on a per MWh basis) for each MWh of such Electrical Output that Buyer was unable to purchase. The damages provided in this Section 4.7 shall be the sole and exclusive remedy of Buyer for any failure of Seller to deliver Electrical Output to Buyer.

(b) No later than the tenth (10th) Day of the month following any month in which Seller owes liquidated damages to Buyer pursuant to Section 4.7(a), Buyer shall deliver

to Seller an invoice showing the amounts owed by Seller and a description, in reasonable detail, of the calculation of damages resulting from Seller's failure to deliver Electrical Output. Seller shall credit Buyer, in an amount equal to any undisputed amounts set forth in thc invoice received from Buyer, against the amounts owed by Buyer to Seller, *provided* that if the amount of such credit is greater than the amount payable by Buyer for such month, the excess portion of such credit shall be applied by Seller to reduce the amount payable by Buyer hereunder in subsequent month(s).

## ARTICLE 5
## OPERATION AND MAINTENANCE OF THE FACILITY

5.1 Seller's Core Obligation

Seller will operate and maintain, or cause the operation and maintenance of, the Plant in accordance with Prudent Industry Practices and otherwise in accordance with this Agreement.

5.2 Seller's Choice of Operator

Seller will, during the Term, only employ or contract with appropriately qualified (as determined in Seller's sole discretion) personnel for the purposes of operating and maintaining the Plant.

5.3 Access and Information

(a) Each Party will keep complete and accurate records and all other data that the Parties mutually agree, and memorialize in the Operating Procedures, that will be required by either Party for the purpose of proper administration of this Agreement, including without limitation metering records, billing records kept in accordance with Section 10.2, and such records regarding ownership, management, control, operation and maintenance of the Plant as may be required by any applicable Law. Each Party will maintain such records for a minimum of six (6) years and for any additional length of time required by any applicable Law. Subject to the confidentiality requirements of Section 17.2, each Party will, upon at least five (5) Business Days written request of the other Party, provide the other Party with prompt reasonable access to records and data that relate to this Agreement or either Party's performance of its obligations hereunder.

(b) Upon at least five (5) Business Days prior notice (in light of the circumstances) and subject to the safety rules and regulations of Seller and Buyer's execution of an access agreement reasonably acceptable to Seller, Seller will provide Buyer and its authorized agents, employees and inspectors with reasonable access to the Plant: (i) for the purpose of reading or testing metering equipment in accordance with Section 8.2, (ii) in connection with the operation and maintenance of the Interconnection Facilities, (iii) to provide tours of the Plant to customers and other guests of Buyer, and (iv) for other reasonable purposes at the reasonable request of Buyer.

5.4 Permits; Compliance with Laws

(a) Subject to the right of Contest, Seller will, at its expense, acquire and maintain in effect, from any and all Government Agencies with jurisdiction over Seller and/or the Plant, all Governmental Approvals, in each case necessary (i) for the construction, operation and maintenance of the Plant in accordance with this Agreement, and (ii) for Seller to perform its obligations under this Agreement, except to the extent the failure to do so would not have a material adverse effect on the construction, operation and maintenance of the Plant or Seller's ability to perform its obligations hereunder.

(b) Subject to the right of Contest, Seller will, at all times, comply in all material respects with all Laws and Governmental Approvals applicable to it and/or to the Plant, including all applicable environmental laws in effect at any time during the Term. During the term of this Agreement, Seller shall submit to Buyer's Authorized Representative copies of any formal written notice received by Seller of Seller's violation of (i) any operating permit issued in connection with the Plant or (ii) any federal or state law or regulation applicable to the Plant, except to the extent such violation does not have a material adverse effect on the construction, operation and maintenance of the Plant or Seller's ability to perform its obligations hereunder.

(c) Subject to the right of Contest, Buyer will, at all times, comply in all material respects with all Laws and Governmental Approvals necessary for Buyer to perform its obligations under this Agreement.

(d) Subject to the right to Contest their applicability, both Parties will comply with all applicable RTO Requirements in all material respects.

5.5 Operating Procedures

Buyer and Seller will endeavor to develop written operating procedures (**"Operating Procedures"**) before interconnection with the NIPSCO and RTO systems, which Operating Procedures will only be effective if made by mutual written agreement of the Parties. The Parties agree that the Operating Procedures they will endeavor to establish will cover the protocol under which the Parties will perform their respective obligations under this Agreement and will include, but will not be limited to, procedures concerning the following: (1) the method of Day-to-Day communications, and (2) key personnel lists for Seller and Buyer. Such Operating Procedures shall be completed no later than September 30, 2007.

As a means of securing effective cooperation and interchanges of information and of providing consultation on a prompt and orderly basis between the Parties in connection with various administrative, commercial and technical issues which may arise during the performance of this Agreement, the Operating Procedures will also provide that the Parties will both appoint an authorized representative (with respect to each Party, the "**Authorized Representative**") and may appoint an alternate (with respect to each Party, the "**Alternate**") to act in its Authorized Representative's absence. The Authorized

Representatives and Alternates shall be managers well experienced with regard to matters relating to the implementation of the Parties' rights and obligations under this Agreement. Each Party will notify the other in writing of its Authorized Representative and Alternate and these appointments will remain in full force and effect until written notice of substitution is delivered to the other Party.

## ARTICLE 6
## SCHEDULING, DELIVERY AND TRANSMISSION

6.1 Seller's Delivery-Related Notice Obligations

Seller will in a timely fashion inform Buyer of any deratings or outages affecting the Plant to the extent that more than twenty (20) percent of Seller's wind turbines are unavailable and will promptly update Seller's notice to the extent of any material changes in this information.

6.2 Scheduling/Market Participant

The Parties will reasonably cooperate with each other with respect to the bidding and scheduling with NIPSCO and/or the RTO of the Electrical Output to be sold and delivered by Seller and accepted and purchased by Buyer. Buyer will be responsible for all such bidding and scheduling. The Parties agree that Buyer shall be the RTO Market Participant for the Plant (as defined by the RTO Requirements), except in connection with the delivery of test energy pursuant to Section 9.2 or after the occurrence of an Event of Default with respect to Buyer.

6.3 Environmental Quality Certification Requirements

Seller agrees to use Commercially Reasonable Efforts to conform its administration of this Agreement to fall within the parameters contained within the requirements of any Credits or similar benefits for renewable energy adopted by the State of Indiana in effect on the Effective Date, to enable qualification of the Electrical Output as renewable energy, as defined in those requirements.

Notwithstanding anything to the contrary set forth herein, nothing in Section 6.2 or this Section 6.3 shall require Seller to take any action effecting, or which would otherwise result in, any reduction in the Electrical Output or cause Seller to incur additional costs as a result of such provisions.

6.4 Transmission.

Buyer represents that it intends to deliver and sell all of the Electrical Output to the RTO at the Point of Metering and does not intend to utilize any Transmission Services. If Buyer nevertheless utilizes Transmission Services for the Electrical Output during the Term or is required (due to a change in the applicable transmission rules) to use Transmission Services in order to accept deliveries of the Electrical Output at the Point of

Metering, then Buyer shall be responsible for arranging for all Transmission Services required to effectuate Buyer's acceptance of delivery and purchase of Electrical Output, including, without limitation, obtaining Transmission Service, in an amount of capacity equal to the Designated Nameplate Capacity Rating, and shall be responsible for the payment of any charges related to such Transmission Services hereunder, including, without limitation, charges for transmission or wheeling services, ancillary services, imbalance, control area services, congestion charges, location marginal pricing, transaction charges and line losses. The Parties acknowledge that the purchase price of Electrical Output does not include charges for such Transmission Services, all of which shall be paid by Buyer.

## ARTICLE 7
## INTERCONNECTION

7.1 Interconnection Facilities

Seller will install, operate, maintain and control (or cause the installation, operation, maintenance and control) during the Term at Seller's sole cost and expense all Interconnection Facilities located at the Plant site up to, and including, the Point of Metering, and Buyer shall have no responsibility for any of the costs and expenses associated with interconnection of the Plant at its Name Plate Capacity Rating up to and including the Point of Metering including the costs of any system upgrades beyond the Point of Metering necessary to interconnect with NIPSCO and/or the RTO for delivery of the Electrical Output to the Point of Metering.

7.2 Point of Metering

Seller will have the responsibility, at its expense, to deliver the Electrical Output to Buyer at the Point of Metering.

7.3 Title; Risk of Loss; Exclusive Control

As between the Parties, Seller will be deemed to be in exclusive control of the Electrical Output before the Point of Metering and Buyer will be deemed to be in exclusive control of the Electrical Output at and from the Point of Metering. Title and risk of loss related to the Electrical Output will transfer from Seller to Buyer at the Point of Metering. Seller warrants that it will deliver the Electrical Output to the Point of Metering free and clear of all liens, security interests, claims and encumbrances or any interest therein or thereto by any person.

7.4 Interconnection Agreement

Seller shall use Commercially Reasonable Efforts to conclude the Interconnection Agreement and any agreements required for the Plant under the RTO Requirements. The Interconnection Agreement shall include provisions with respect to providing the Plant

with the capability to transmit at least the Designated Name Plate Capacity Rating of the Plant in accordance with the terms of this Agreement.

7.5 Station Service Power – Retail

Seller will be solely responsible for obtaining and paying for all Station Service Power – Retail.

## ARTICLE 8
## METERING

8.1 Meter Requirements

The meters and metering equipment (collectively, the "**Meters**") at the Point of Metering will be installed, maintained and repaired in accordance with the Interconnection Agreement and will be owned and operated in accordance with the Interconnection Agreement. The Interconnection Agreement shall provide that the Meters will be installed such that they will measure the Electrical Output on the high side of the Plant's step-up transformers at the Point of Metering. Buyer will have no responsibility for the ownership, operation, maintenance and control of the Meters.

8.2 Inspection and Testing of the Meters

(a) The Interconnection Agreement shall provide that NIPSCO and/or the RTO must inspect, test and adjust the Meters at least once every two years and at a time mutually convenient to Buyer and Seller. Seller will provide Buyer with at least five (5) Business Days advance notice of, and permit a representative of Buyer to witness and verify, such inspections, tests and adjustments, and will cause NIPSCO and/or the RTO to test any adjustments to be made thereto in accordance with Section 8.2(c).

(b) In addition to the other inspections and tests required under Section 8.2(a), the Interconnection Agreement shall allow the following inspections and tests. Upon reasonable prior written notice by Buyer, Seller will perform additional inspections or tests of the Meters. Seller and Buyer will agree on a mutually convenient time for such inspections or tests, and Seller will permit a qualified representative of Buyer to inspect or witness such testing of the Meters. The actual expense of any such requested additional inspection or testing will be borne by Buyer unless, upon such inspection or testing, the Meters are found to register inaccurately by more than +/-0.5%, in which event the expense of the requested additional inspection or testing will be borne by Seller.

(c) If, as a result of any test performed in accordance with this Section 8.2 and/or by NIPSCO and/or the RTO, any of the Meters is found to be registering outside the applicable ANSI accuracy standard in effect at the time of the test, such Meter shall be restored to the ANSI accuracy standard or an accurate meter substituted and payments pursuant to this Agreement shall be corrected in accordance with this Section 8.2(c). If the payments by Buyer to Seller must be corrected, as required in this Section 8.2(c), the

account between Seller and Buyer shall be corrected for a period equal to one-half of the elapsed time since the most recent test, up to a maximum correction period of six months, by applying the percentage of inaccuracy so found. If, however, the meter became defective or inaccurate at a reasonably ascertainable time since the most recent test, the correction shall extend back to such time. Should metering equipment at any time fail to register, the energy delivered shall be determined from the best available data. The Meters shall be kept under seal, and such seals may only be broken when the meters are to be tested, adjusted, modified, or relocated in accordance with this Agreement and/or the Interconnection Agreement. When there is any break to a seal, Seller must notify Buyer as soon as possible.

## ARTICLE 9
## COMMISSIONING AND TESTING

9.1 Seller's Notice and Testing Obligation

Seller will notify Buyer of the commissioning and initial testing of the Plant and of any capacity tests thereafter that are required by the RTO, which tests must be conducted in accordance with RTO Requirements or appropriate reliability councils(s).

9.2 Test Energy

Seller may deliver Electrical Output generated prior to the Commercial Operation Date to the interconnection point with NIPSCO and/or RTO and sell such Electrical Output to any third party. Buyer shall have no rights under this Agreement with respect to such Electrical Output or the sale of such Electrical Output to third parties.

## ARTICLE 10
## BILLING AND PAYMENT

10.1 Billing

Seller shall be responsible for billing between the Parties and shall bill Buyer (either electronically or otherwise) by the tenth (10th) day of each Month at the price per MWh specified in Section 4.4 for the Electrical Output delivered to Buyer at the Point of Metering during the previous Month based on readings of the Meters as provided in Section 4.5. In addition, Seller shall bill Buyer for amounts due and owing pursuant to Section 4.6 in accordance with the provisions of Section 4.6.

10.2 Payment

(a) In furtherance of Section 10.1, Seller shall promptly provide a copy of the invoice for each Month to Buyer by facsimile and US first class mail. If Buyer, in good faith, disputes the amount of any such invoice or any part thereof, Buyer will pay to Seller such amount as it acknowledges is correct when due plus provide notice of the disputed amount. If Buyer disputes the amount due, Buyer shall provide supporting

documentation to verify the amount paid. Upon the Parties' resolution of any accounting discrepancy or disagreement, Buyer and Seller agree to settle the outstanding balance which is due within five (5) Business Days following such resolution. If it is ultimately determined that Buyer owes the remainder of the disputed amount, Buyer shall pay Seller the amount with interest, as determined below.

(b) Buyer's payment under this Agreement will be due on the first Business Day that is at least 15 Days following the date of the invoice and must be made by electronic fund transfer to Seller's account. Payments received after the due date (including as a result of a dispute permitted under Section 10.2 (a)) shall be considered late and shall bear interest on the payment due at a rate equal to the prime rate (the "Prime Rate") plus three percent (3%) as published in the Wall Street Journal from time to time, times the number of Days elapsed from and including the Day after the due date, to and including the payment date. Alternatively, any overpayment to Seller made by Buyer arising solely out of an error made by Seller shall be reimbursed to Buyer with interest at a rate equal to the Prime Rate times the number of days elapsed from and including the day after the day overpayment was made by Buyer to and including the date of reimbursement by Seller to Buyer.

(c) Each Party shall have the right from time to time, upon written request and at its own expense, to audit the other Party's books and records to verify the information provided by that Party under this Article 10.

(d) Any claim by either Party based upon error in any statement must be made within twelve (12) months of the date of the invoice in which the error first occurred. Following such twelve (12) month period, the invoice and payments related thereto shall be final.

## ARTICLE 11
## TAXES, FEES, AND TAX CREDITS

Seller will pay or cause to be paid all taxes, fees, levies, assessments, penalties, licenses, or charges of any Government Agency (collectively, "**Taxes**") on or with respect to Electrical Output imposed before the Point of Metering. Buyer will pay or cause to be paid all Taxes on or with respect to the Electrical Output imposed at or after the Point of Metering. In the event Seller is required to remit or pay Taxes that are Buyer's responsibility under this Agreement, Buyer shall promptly reimburse Seller for such Taxes. If Buyer is required to remit or pay Taxes that are Seller's responsibility under this Agreement, then Seller shall promptly reimburse Buyer for such Taxes. Seller will receive and retain any existing or future tax credits or other tax benefits available to the owner or operator of the Plant, including all federal income tax credits under the Internal Revenue Code of 1986, as amended.

## ARTICLE 12
## REPRESENTATIONS AND WARRANTIES

12.1 Representations and Warranties of Seller

Seller represents and warrants to Buyer as of the Effective Date as follows:

(a) Seller is a limited liability company duly organized, validly existing and in good standing under the laws of the state of Delaware and is qualified and in good standing in each other jurisdiction where the failure so to qualify would have a material adverse effect upon the business or financial condition of Seller or the Plant, and Seller has all requisite power and authority to conduct its business, to own its properties and to execute, deliver and perform its obligations under this Agreement.

(b) The execution, delivery, and performance of its obligations under this Agreement by Seller have been duly authorized by all necessary action, and do not:

(i) as to execution and delivery but not performance, require any consent or approval of Seller's members or managers which has not been obtained and each such consent and approval that has been obtained is in full force and effect,

(ii) violate any provision of any law, rule, regulation, order, writ, judgment, injunction, decree, determination, or award having applicability to Seller or any provision of the organizational documents of Seller, the violation of which could reasonably be expected to have a material adverse effect on the ability of Seller to perform its obligations under this Agreement,

(iii) result in a breach of or constitute a default under any provision of the organizational documents of Seller, or

(iv) result in a breach of or constitute a default under any agreement relating to the management or affairs of Seller or any indenture or loan or credit agreement or any other agreement, lease, or instrument to which Seller is a party or by which Seller or its properties or assets may be bound or affected, the breach or default of which could reasonably be expected to have an adverse effect on the ability of Seller to perform its obligations under this Agreement.

(c) This Agreement constitutes a legal, valid and binding obligation of Seller and is enforceable against Seller in accordance with its terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or affecting the rights of creditors generally and except as the enforceability of this Agreement is subject to the application of (i) general principles of equity (regardless of whether considered in a proceeding in equity or at law), including, without limitation, the possible unavailability of specific performance, injunctive relief or any other

equitable remedy and (ii) concepts of materiality, reasonableness, good faith and fair dealing.

(d) There is no pending or, to the best of Seller's knowledge, threatened action or proceeding affecting Seller before any court, Government Agency or arbitrator that could reasonably be expected to have a material adverse effect on the financial condition or operations of Seller or the ability of Seller to perform its obligations hereunder, or that purports to affect the legality, validity or enforceability of this Agreement.

12.2 Representations and Warranties of Buyer

Buyer represents and warrants to Seller as of the Effective Date as follows:

(a) Buyer is a corporation duly organized and validly existing under the laws of Indiana and has the full legal right, power and authority to conduct its business, to own its properties and to execute, deliver and perform its obligations under this Agreement.

(b) The execution, delivery, and performance of its obligations under this Agreement by Buyer have been duly authorized by all necessary corporate action, and do not:

(i) as to execution and delivery, but not performance, require any consent or approval of Buyer's board of directors or any Buyer member or shareholder which has not been obtained and each such consent and approval that has been obtained is in full force and effect,

(ii) violate any provision of any law, rule, regulation, order, writ, judgment, injunction, decree, determination, or award having applicability to Buyer, the violation of which could reasonably be expected to have a material adverse effect on the ability of Buyer to perform its obligations under this Agreement,

(iii) result in a breach of or constitute a default under any provision of the articles of incorporation or by-laws of Buyer, or

(iv) result in a breach of or constitute a default under any agreement relating to the management or affairs of Buyer or any indenture or loan or credit agreement or any other agreement, lease, or instrument to which Buyer is a party or by which Buyer or its properties or assets may be bound or affected, the breach or default of which could reasonably be expected to have a material adverse effect on the ability of Buyer to perform its obligations under this Agreement.

(c) This Agreement constitutes a legal, valid and binding obligation of Buyer and is enforceable against Buyer in accordance with its terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or affecting the rights of creditors generally and except as the enforceability of this

Agreement is subject to the application of (i) general principles of equity (regardless of whether considered in a proceeding in equity or at law), including, without limitation, the possible unavailability of specific performance, injunctive relief or any other equitable remedy and (ii) concepts of materiality, reasonableness, good faith and fair dealing.

(d) There is no pending or, to the best of Buyer's knowledge, threatened action or proceeding affecting Buyer before any court, Government Agency or arbitrator that could reasonably be expected to have a material adverse effect on the financial condition or operations of Buyer or the ability of Buyer to perform its obligations hereunder, or that purports to affect the legality, validity or enforceability of this Agreement.

## ARTICLE 13
## [Reserved]

## ARTICLE 14
## FORCE MAJEURE EVENT

14.1 Force Majeure Event Defined

(a) As used in this Agreement, "**Force Majeure Event**" means any event, condition, cause or circumstance that is beyond the reasonable control of, and without the fault or negligence of, the Party claiming such Force Majeure Event. Force Majeure Event includes, without limitation, acts of God; unusually severe actions of the elements such as lightning strikes that affect Plant equipment, earthquakes, floods, hurricanes, tornadoes or winds in excess of 120 miles per hour; sabotage; terrorism; war; riots or public disorders; failure of NIPSCO and/or the RTO to install and energize the Interconnection Facilities in accordance with the Interconnection Agreement and by no later than October 31, 2007; strikes or other labor disputes and actions or failures to act of any Government Agency (including expropriation and requisition), to the extent such cause or event prevents or delays performance of any obligation imposed on the Party claiming such Force Majeure Event (other than an obligation to pay money).

(b) Force Majeure Event does not include: (i) causes or events affecting the performance of third-party contractors or suppliers of goods or services except to the extent caused by an event that otherwise is a Force Majeure Event under subsection (a) of this Section 14.1, (ii) the unavailability of equipment that would have been avoided by compliance with Prudent Industry Practices by the Party claiming the Force Majeure Event, (iii) changes in market conditions that affect the price of energy or capacity, (iv) the failure to timely apply for or to obtain Governmental Approvals that Seller knows or should know on the Effective Date are required for the construction or operation of the Plant, or (v) any Delivery Excuse.

14.2 Applicability of Force Majeure Event

Except for the obligation to pay money that is due and owing, neither Party will be in breach or liable for any delay or failure in its performance under this Agreement to the extent such performance is prevented or delayed due to a Force Majeure Event, provided that:

(a) the non-performing Party will give the other Party prompt written notice (and will do so in any case within 96 hours) of the commencement of the Force Majeure Event, with details to be supplied within 10 Days after the commencement of the Force Majeure Event further describing the particulars of the occurrence of the Force Majeure Event;

(b) the delay in performance will be of no greater scope and of no longer duration than is caused by the Force Majeure Event;

(c) the Party whose performance is delayed or prevented will proceed with Commercially Reasonable Efforts to overcome or avoid the events or circumstances preventing or delaying performance and will provide weekly written progress reports to the other Party during the period that performance is delayed or prevented describing actions taken and to be taken to remedy the consequences of the Force Majeure Event, the schedule for such actions and the expected date by which performance will no longer be affected by the Force Majeure Event; and

(d) when the performance of the Party claiming the Force Majeure event is no longer being delayed or prevented, that Party will give the other Party written notice to that effect.

In no event shall the Force Majeure provisions of this Agreement give Seller any right to payment beyond that which is due and owing to Seller under this Agreement.

## ARTICLE 15
## TERMINATION AND DEFAULT

15.1 Event of Default

(a) The occurrence of any one of the following will constitute an **"Event of Default"** with respect to Seller:

(i) Seller fails to make payments for good faith undisputed amounts due under this Agreement to Buyer within ten (10) Business Days after receiving notice from Buyer that such payment is unpaid and due;

(ii) Seller fails to comply with any material provision of this Agreement (other than the obligation to pay money when due), and such failure continues uncured for thirty (30) Days after notice thereof by Buyer, provided that

if such failure is not capable of being cured within such period of 30 Days with the exercise of reasonable diligence, then such cure period will be extended for an additional reasonable period of time so long as Seller is exercising reasonable diligence to cure such failure;

(iii) Seller (a) admits in writing its inability to pay its debts as such debts become due; (b) makes a general assignment or an arrangement or composition with or for the benefit of its creditors; (c) fails to controvert in a timely and appropriate manner, or acquiesces in writing to, any petition filed against such Party under any bankruptcy or similar law; or (d) takes any action for the purpose of effecting any of the foregoing;

(iv) A proceeding or case is commenced, without the application or consent of Seller, in any court of competent jurisdiction, seeking: (a) its liquidation, reorganization of its debts, dissolution or winding-up, or the composition or readjustment of its debts; (b) the appointment of a receiver, custodian, liquidator or the like of Seller or of all or any substantial part of its assets; or (c) similar relief in respect of Seller under any law relating to bankruptcy, insolvency, reorganization of its debts, winding-up, composition or adjustment of debt, and such proceeding or case remains in effect, for a period of sixty (60) Days;

(v) Any representation made by Seller under Section 12.1 is false in any material respect when made and Seller fails to remedy such false representation within sixty (60) Days after notice thereof by Buyer;

(vi) The bankruptcy, insolvency, reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar proceeding with respect to any entity providing any Credit Support for Seller's performance under this Agreement (whether under any present or future statute, law, or regulation), including the appointment of any trustee, receiver, custodian or the like of such entity or all or any substantial part of its assets unless such Credit Support is replaced in form and substance and by an entity satisfactory to Buyer within thirty (30) Days after Seller becomes aware of such proceeding;

(vii) Seller fails to deliver and maintain Credit Support in the amounts and on the dates required by Section 2.5 (*provided* that Seller has no obligation to replenish the amount of any Credit Support that is drawn upon by Buyer hereunder); or

(viii) Abandonment of the construction of the Plant by Seller which continues for any uninterrupted period in excess of 180 consecutive days.

(b) The occurrence of any one of the following will constitute an "**Event of Default**" with respect to Buyer:

(i) Buyer fails to make payments for good faith undisputed amounts due under this Agreement to Seller within five (5) Business Days after receiving notice from Seller that such payment is unpaid and due;

(ii) Buyer fails to comply with any material provision of this Agreement (other than the obligation to pay money when due), and such failure continues uncured for thirty (30) Days after notice thereof by Seller, provided that if such failure is not capable of being cured within such period of 30 Days with the exercise of reasonable diligence, then such cure period will be extended for an additional reasonable period of time so long as Buyer is exercising reasonable diligence to cure such failure;

(iii) Buyer (a) admits in writing its inability to pay its debts as such debts become due; (b) makes a general assignment or an arrangement or composition with or for the benefit of its creditors; (c) fails to controvert in a timely and appropriate manner, or acquiesce in writing to, any petition filed against such Party under any bankruptcy or similar law; or (d) takes any action for the purpose of effecting any of the foregoing;

(iv) A proceeding or case is commenced, without the application or consent of Buyer, in any court of competent jurisdiction, seeking: (a) its liquidation, reorganization of its debt, dissolution or winding up, or composition or readjustment of its debt; (b) the appointment of a receiver, custodian, liquidator or the like of Buyer or of all or any substantial part of its assets; or (c) similar relief in respect of Buyer under any law relating to bankruptcy, insolvency, reorganization of its debts, winding-up, composition or adjustment of debts, and such proceeding remains in effect, for a period of sixty (60) Days;

(v) The bankruptcy, insolvency, reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar proceeding with respect to any entity providing any Credit Support for Buyer's performance under this Agreement (whether under any present or future statute, law, or regulation), including the appointment of any trustee, receiver, custodian or the like of such entity or all or any substantial part of its assets unless such Credit Support is replaced in form and substance and by an entity satisfactory to Seller and the Financing Parties within thirty (30) Days (or such shorter period as required by the Financing Parties under the Financing Documents) after such proceeding;

(vi) Any representation made by Buyer under Section 12.2 is false in any material respect when made and Buyer fails to remedy such false representation within 60 Days after notice thereof by Seller; or

(vii) Buyer fails to deliver and maintain Credit Support in the amounts and on the dates required by Section 2.5 (*provided* that Buyer has no obligation to replenish the amount of any Credit Support that is drawn upon by Seller hereunder).

15.2 Remedies for Default

(a) Subject to the provisions of subsection (c) below, if an Event of Default occurs with respect to a defaulting Party at any time during the Term, the non-defaulting Party may, for so long as the Event of Default is continuing, (i) deliver a written notice that establishes a date (which date will be no earlier than forty-five (45) Days after the Non-Defaulting Party delivers notice) on which this Agreement will be terminated unless such Event of Default is cured prior to the date of termination, (ii) suspend performance of its obligations and duties hereunder immediately upon delivering written notice to the defaulting Party of its intent to exercise its suspension rights, and/or (iii) pursue any other remedies available under this Agreement or now or hereafter existing at law or in equity, except to the extent such remedies are expressly limited by this Agreement.

(b) Notwithstanding the foregoing, (i) Buyer may not terminate this Agreement on account of a default by Seller pursuant to Section 15.1(a)(ii) (but may exercise its other remedies hereunder) unless such default results in the delivery by Seller of Electrical Output and Credits that Seller is obligated to deliver to Buyer hereunder to a Person other than Buyer, and (ii) Buyer shall not exercise its remedies hereunder unless and until all of the requirements of subsection (c) below have been satisfied with respect to any Financing Parties.

(c) Notwithstanding the foregoing provisions of this Section 15.2, in the case of an Event of Default by Seller pursuant to Section 15.1(a)(ii), Buyer shall provide the Financing Parties (if any) with notice of such Event of Default and the Financing Parties shall have the right (but not the obligation) for forty-five (45) Days after receipt of such notice either to cure the Event of Default on behalf of Seller, or, upon payment to Buyer of amounts due from Seller but not paid by Seller, to assume, or cause its designee or a lessee or purchaser of the Plant to assume, all of the rights and obligations of Seller under this Agreement arising after the date of such assumption as more fully described in Section 17.1.

15.3 Injunctive Relief.

Each Party shall be entitled to seek the restraint by injunction of any actual or threatened breach of any material obligation of the other Party under this Agreement. The Parties in any action for restraint by injunction agree that they shall each request that all expenses incurred in such proceeding, including, but not limited to, reasonable counsel fees, be apportioned in the final decision based upon the respective merits of the positions of the Parties.

15.4 Damages Payable in the Event of Termination.

Notwithstanding the foregoing, the Parties acknowledge and agree that if this Agreement is terminated due to an Event of Default by either Party, the actual or direct damages incurred by the non-defaulting Party shall include:

(a) in the case of a termination by Seller due to an Event of Default by Buyer, the net present value of the difference, if positive, between (x) the amount that Buyer would have been required to pay to Seller pursuant to this Agreement for delivery of all Electrical Output that would have been delivered by Seller hereunder during the remainder of the Term (absent termination of this Agreement and based on an assumption as to the amount of Electrical Output calculated using commercially reasonable projections based on historical performance of the Plant if such termination occurs two (2) years or more after the Commercial Operation Date; if such termination occurs earlier than two (2) years after the Commercial Operation Date then the Parties shall jointly retain an independent wind resource consultant to estimate the Electrical Output that would have been delivered by Seller hereunder during the remainder of the Term, taking into account all relevant data, and such estimate shall be binding on the Parties) and (y) the net amount, if any, payable to Seller by a third party pursuant to any replacement power purchase agreement that Seller using Commercially Reasonable Efforts enters into for the replacement of such Electrical Output, *provided* that to the extent Seller is unable to remarket all of such Electrical Output, then the net amount described in clause (y) shall be $0 and the damages owed by Buyer shall also include the then-current amount of the PTC (on a per MWh basis) on an After-Tax Basis for each MWh of such energy that Seller was unable to remarket.

(b) in the case of a termination by Buyer due to an Event of Default by Seller, the net present value of the difference, if positive, between (x) the amount that Buyer is obligated to pay to a third party pursuant to any replacement power purchase agreement that Buyer using Commercially Reasonable Efforts enters into for the Electrical Output that would have been delivered by Seller hereunder during the remainder of the Term (absent termination of this Agreement and based on an assumption as to the amount of Electrical Output calculated using commercially reasonable projections based on historical performance of the Plant if such termination occurs two (2) years or more after the Commercial Operation Date; if such termination occurs earlier than two (2) years after the Commercial Operation Date then the Parties shall jointly retain an independent wind resource consultant to estimate the Electrical Output that would have been delivered by Seller hereunder during the remainder of the Term, taking into account all relevant data, and such estimate shall be binding on the Parties) and (y) the amount that Buyer would have been required to pay to Seller pursuant to this Agreement for such Electrical Output *provided* that in the event Buyer is unable to purchase replacement electric energy that includes Credits, then the net amount described in clause (ii) shall also include the then-current amount of the Credit (on a per MWh basis) for each MWh of such Electrical Output that Buyer was unable to purchase, and

The damages provided in this Section 15.4 shall be the sole and exclusive remedy of a Party as a result of the termination of this Agreement due to an Event of Default by the other Party.

## ARTICLE 16
## INDEMNIFICATION AND LIABILITY

16.1 Indemnification

(a) Each Party will indemnify, defend and hold the other Party and its officers, directors, Affiliates, agents, employees, contractors and subcontractors, harmless from and against any and all Claims, to the extent (i) caused by any act or omission (or alleged act or omission) of the indemnifying Party or the indemnifying Party's own officers, directors, Affiliates, agents, employees, contractors or subcontractors and (ii) such Claims arise out of or are in any manner connected with the performance of this Agreement by such indemnifying Party.

(b) Notwithstanding anything to the contrary in this Agreement, each Party will indemnify, defend and hold harmless the other Party from any Claims arising from the Electrical Output that occur when risk of loss of the Electrical Output is vested in the indemnifying Party.

(c) Nothing in the foregoing provisions of this Section 16.1 will be construed to require one Party to this Agreement to indemnify the other Party to this Agreement or its officers, directors, Affiliates, agents, employees, contractors and subcontractors for any cost or expense that is to be borne by such other Party pursuant to any express provision of this Agreement or for injury or damage caused by the negligence or willful misconduct of the other Party or its officers, directors, Affiliates, agents, employees, contractors and subcontractors.

16.2 Fines

(a) Except as set forth in paragraphs (b) and (c) below, any fines, penalties or other costs incurred by either Party or such Party's agents, employees or subcontractors for non-compliance by such Party, its agents, employees or subcontractors with the requirements of any Laws or Governmental Approvals will not be reimbursed by the other Party but will be the sole responsibility of such non-complying Party.

(b) If such fines, penalties or other costs are assessed against Buyer by any Government Agency or court of competent jurisdiction due to the non-compliance by Seller with any Laws or Governmental Approvals, Seller will indemnify and hold harmless Buyer against any and all losses, liabilities, damages and claims suffered or incurred because of the failure of Seller to comply therewith, subject to refund in the event that Seller or Buyer prevails in any Contest described below. Seller will also reimburse Buyer for any and all legal or other expenses (including attorneys' fees) reasonably incurred by Buyer in connection with such losses, liabilities, damages and claims.

(c) If such fines, penalties or other costs are assessed against Seller by any Government Agency or court of competent jurisdiction due to the non-compliance by Buyer with any Laws or Governmental Approvals, Buyer will indemnify and hold harmless Seller against

any and all losses, liabilities, damages and claims suffered or incurred because of the failure of Buyer to comply therewith, subject to refund in the event that Buyer or Seller prevails in any Contest described below. Buyer will also reimburse Seller for any and all legal or other expenses (including attorneys' fees) reasonably incurred by Seller in connection with such losses, liabilities, damages and claims.

(d) In the case of Section 16(b) and (c), either Party will, upon written notice to the other Party, have the right to reasonably Contest in the name of either or both Parties, as required, or to require the other Party to reasonably Contest, the assessment of such fines, penalties or costs and the Party requesting such Contest will be responsible for any costs and expenses (including the costs and expenses of the other Party) relating to such Contest.

16.3 Limitations of Liability, Remedies and Damages.

(a) Each Party acknowledges and agrees that in no event will any partner, shareholder, member, manager, owner, officer, director, employee or affiliate of either Party be personally liable to the other Party for any payments, obligations, or performance due under this Agreement or any breach or failure of performance of either Party and the sole recourse for payment or performance of the obligations under this Agreement will be against Seller or Buyer and each of their respective assets and not against any other Person, except for such liability as expressly assumed by an assignee pursuant to an assignment of this Agreement in accordance with the terms hereof or such liability assumed pursuant to any Credit Support.

(b) THE EXPRESS REMEDY, PAYMENT OBLIGATIONS, OR MEASURE OF DAMAGES SET FORTH IN SECTIONS OF THIS AGREEMENT WILL BE THE SOLE AND EXCLUSIVE REMEDY WITH RESPECT TO SUCH SECTIONS IN ACCORDANCE WITH THE TERMS AND CONDITIONS OF SUCH SECTIONS. UNLESS EXPRESSLY PROVIDED IN THIS AGREEMENT, NEITHER PARTY WILL BE LIABLE TO THE OTHER FOR CONSEQUENTIAL, INCIDENTAL, PUNITIVE, EXEMPLARY OR INDIRECT DAMAGES SUFFERED BY THAT PARTY OR BY ANY CUSTOMER OR ANY PURCHASER OF THAT PARTY, LOST PROFITS OR OTHER BUSINESS INTERRUPTION DAMAGES, WHETHER BY STATUTE, IN TORT OR CONTRACT, UNDER ANY INDEMNITY PROVISION OR OTHERWISE (EXCEPT TO THE EXTENT THAT AN INDEMNIFYING PARTY PURSUANT TO THE PROVISIONS OF SECTION 16.1 HEREOF IS OBLIGATED TO INDEMNIFY AGAINST THIRD PARTY CLAIMS FOR CONSEQUENTIAL, INCIDENTAL, PUNITIVE, EXEMPLARY OR INDIRECT DAMAGES OR LOST PROFITS OR OTHER BUSINESS INTERRUPTION DAMAGES). IT IS THE INTENT OF THE PARTIES THAT THE LIMITATIONS HEREIN IMPOSED ON THE MEASURE OF DAMAGES BE WITHOUT REGARD TO THE CAUSE OR CAUSES RELATED THERETO, INCLUDING, WITHOUT LIMITATION, THE NEGLIGENCE OF ANY PARTY, WHETHER SUCH NEGLIGENCE BE SOLE, JOINT OR CONCURRENT, OR ACTIVE OR PASSIVE. TO THE EXTENT ANY DAMAGES

REQUIRED TO BE PAID HEREUNDER ARE LIQUIDATED, THE PARTIES ACKNOWLEDGE THAT THE DAMAGES ARE DIFFICULT OR IMPOSSIBLE TO DETERMINE, OTHERWISE OBTAINING AN ADEQUATE REMEDY IS INCONVENIENT AND THE LIQUIDATED DAMAGES CONSTITUTE A REASONABLE APPROXIMATION OF THE HARM OR LOSS.

(c) The provisions of this Section 16 will survive the termination of this Agreement.

## ARTICLE 17
## GENERAL

17.1 Assignment

(a) This Agreement may not be assigned by either Party without the prior written approval of the other Party, which shall not be unreasonably withheld. Notwithstanding the foregoing, no consent shall be required for:

(i) Any assignment or transfer of this Agreement by Seller to an Affiliate of Seller, provided (A) no Event of Default with respect to Seller has occurred and is then continuing, (B) such Affiliate assumes all of Seller's obligations hereunder in writing, (C) such Affiliate's creditworthiness is equal to or better than that of Seller as reasonably determined by Buyer, and (D) no Event of Default or breach of Seller's obligations, representations or warranties hereunder would occur after giving effect to such assignment (including in respect of any Credit Support required to be provided by Seller pursuant to Section 2.5, which Credit Support shall remain in full force and effect with respect to such Affiliate's obligations hereunder as assignee of Seller as applicable);

(ii) Any assignment or transfer of this Agreement by Seller or Buyer to a Person succeeding to all or substantially all of the assets of such Party, *provided* that such Person's creditworthiness is equal to or better than that of such Party, as reasonably determined by the non-assigning or non-transferring Party;

(iii) Any assignment of this Agreement by Seller to any Financing Party as collateral security for obligations under the Financing Documents entered into with such Financing Parties, including but not limited to as provided in Section 17.1(b); or

(iv) Any assignment by the Financing Parties to a third party after the Financing Parties have exercised their foreclosure rights with respect to this Agreement or the Plant, *provided* that either (A) such Person's creditworthiness is equal to or better than that of such Party, as reasonably determined by the non-assigning or non-transferring Party, or (B) such Person is an experienced owner of wind-powered generating facilities or contracts with an experienced operator of wind-powered generating facilities and assumes all of Seller's remaining

obligations hereunder in writing, including but not limited to Seller's obligations with respect to Credit Support under Section 2.5.

(v) Any assignment by Seller of its rights, interests and obligations under this Agreement with respect to all or any portion of the Plant to an owner trust or an equity investment vehicle or as security to a Financing Party for the purpose of providing financing or refinancing for all or such portion of the Plant. If requested by any Financing Party, Buyer will execute, for the benefit of such Financing Party, an agreement providing for Buyer's consent to each such assignment as security, in form and substance satisfactory to such Financing Party and Buyer. Buyer acknowledges that upon an event of default under any Financing Documents relating to the Plant, any of the Financing Parties may (but shall not be obligated to) assume, or cause its designee or a new lessee or purchaser of the Plant to assume, all of the interests, rights and obligations of Seller thereafter arising under this Agreement.

(vi) Any assignment or transfer by Buyer of this Agreement to an Affiliate of Buyer, provided (A) no Event of Default with respect to Buyer has occurred and is then continuing, (B) Buyer gives Seller written notice thereof, (C) such Affiliate assumes all of Buyer's obligations hereunder in writing, (D) in the event the IURC Order is in effect, such Affiliate is a load-serving entity that benefits from the IURC Order, (E) such Affiliate's creditworthiness is equal to or better than that of Buyer as reasonably determined by Seller (but in no event has a credit rating that is less than BBB by S&P and Baa2 by Moody's), and (F) no Event of Default or breach of Buyer's obligations, representations or warranties hereunder would occur after giving effect to such assignment (including in respect of any Credit Support required to be maintained by Buyer pursuant to Section 2.5, which Credit Support shall remain in full force and effect with respect to such Affiliate's obligations hereunder as assignee of Buyer as applicable).

(b) The foregoing restrictions shall not prohibit Seller from selling limited partnership interests, limited liability company interests, or any other equity or ownership interests, to third parties.

(c) No assignment of this Agreement or of the rights or obligations by Seller will relieve Seller of liability for any breach by the assignee or for any other failure by the assignee to perform its obligations hereunder.

(d) Notwithstanding Section 17.1(a), Buyer will have the right, without consent of Seller, to sell all or part of the Electrical Output and/or Credits to be purchased pursuant to this Agreement to utilities or other third parties in any lawful fashion.

(e) The assigning Party shall give prompt written notice to the other Party of any assignment which does not require the consent of the other Party. Any assignment in violation of this Section 17.1 will be void and of no force or effect.

(f) The provisions of this Section 17.1 are for the benefit of the Financing Parties as well as the Parties hereto, and shall be enforceable by the Financing Parties as express third-party beneficiaries hereof. Buyer hereby agrees that none of the Financing Parties, nor any bondholder or participant for whom they may act or any trustee acting on their behalf, shall be obligated to perform any obligation or be deemed to incur any liability or obligation provided in this Agreement on the part of Seller or shall have any obligation or liability to Buyer with respect to this Agreement except to the extent any of them becomes a Party hereto pursuant to this Section 17.1.

17.2 Confidentiality

This Agreement and any information provided by either Party to the other Party pursuant to this Agreement and labeled "CONFIDENTIAL" will be utilized by the receiving Party solely in connection with the purposes of this Agreement and will not be disclosed by the receiving Party to any third party, except with the providing Party's consent, and upon request of the providing Party will be returned thereto, except that the receiving Party will not be obligated to return any such information contained in documents generated by the receiving Party that: (1) reflect or refer to confidential information provided by the disclosing Party; and (2) are stored electronically by the receiving Party. With respect to any such retained electronically stored confidential information, the receiving Party will continue to comply with the obligations of this Section 17.2. Notwithstanding anything herein to the contrary, the Parties acknowledge and agree that such confidential information may be disclosed to actual and prospective Financing Parties, potential purchasers of equity interests of Seller, suppliers and potential suppliers of major equipment to the Plant and other third parties as and solely to the extent necessary for Buyer and Seller to perform their obligations under this Agreement and the Financing Documents. To the extent that such disclosures are necessary, the Parties also agree that they will in disclosing such information seek to preserve the confidentiality of such disclosures, by requiring a party receiving confidential information to be bound by the terms of this Agreement applicable to such a confidential information. This provision will not prevent either Party from providing any confidential information received from the other Party to any court or regulatory proceeding in accordance with a proper discovery request or in response to the reasonable request or need of any Government Agency charged with regulating the disclosing Party's affairs, provided that, if feasible, the disclosing Party will give prior notice to the other Party of such disclosure and, if so requested by such other Party, will have used all reasonable efforts to oppose or resist the requested disclosure, as appropriate under the circumstances, or to otherwise make such disclosure pursuant to a protective order or other similar arrangement for confidentiality.

17.3 Publicity

No press release, announcement, or other publication in any media (a "**Press Release**") relating to this Agreement, the subject matter of this Agreement or the Plant may be made by any Party unless such Party has delivered to the other Party a copy of such proposed Press Release at least five (5) Days prior to its publication, and giving such other Party an

opportunity to comment thereon. The Parties will cooperate in good faith in developing a Press Release satisfactory in form and substance to both Parties, and no publication of any Press Release by any Party shall be permitted without the consent of the other Party, such consent not to be unreasonably conditioned, withheld, or delayed.

17.4 Naming Rights

Buyer and Seller shall jointly have the right to name the Plant subject to the consent of the other, such consent not to be unreasonably withheld. Each Press Release, community benefit or public relations activity, program or event of any kind whatsoever, which makes any reference to the Plant shall include a prominent statement that the Plant is being or has been "developed by Orion Energy LLC".

17.5 Several Obligations

Except when specifically stated in this Agreement to be otherwise, the duties, obligations, and liabilities of the Parties are intended to be several and not joint or collective. Nothing in the Agreement shall be construed to create an association, trust, partnership, fiduciary relationship, or joint venture or impose a trust or partnership duty, obligation or liability or agency relationship on or with regard to either Seller or Buyer. Each Party shall be liable for its own obligations under this Agreement. Any undertaking by one Party to the other Party under any provision of this Agreement shall not constitute the dedication of the electrical system or any portion thereof of either Party to the public or to the other Party, its customers, or any other person or entity.

17.6 Notices

Any notice of a routine character in connection with the delivery of electric energy or the operation of the Plant may be given in such manner as may be mutually agreeable between the Parties' Authorized Representatives. Any formal notice, demand, request, or communication required or authorized by this Agreement (including, but not limited to, any notice of default or non-performance) shall be delivered in writing either by hand, facsimile, overnight courier or mailed by certified mail, return receipt requested, with postage prepaid, to the following addresses (and shall be deemed to be received (a) when delivered by hand, (b) one day after sent by facsimile, (c) two days after sent by overnight courier, and (d) five days after sent by certified mail):

To Buyer:

PSI Energy, Inc. d/b/a Duke Energy Indiana
1000 East Main Street
Plainfield, Indiana 46168
Attn: President
Telephone: 317-838-1236

Facsimile: 317-838-2111

To Seller:

Benton County Wind Farm LLC
c/o Orion Energy LLC
1611 Telegraph Avenue., Suite 1515
Oakland, CA 94612
Attn: General Counsel
Telephone: 510-267-0320
Facsimile: 510-267-0325

17.7 Captions

All titles, subject headings, section titles and similar items are provided for the purpose of reference and convenience and are not intended to be inclusive, definitive or to affect the meaning of the contents or scope of this Agreement.

17.8 Governing Law/Venue

(a) This Agreement shall be interpreted and governed by the laws of the State of Indiana without regard to conflicts of laws.

(b) THE PARTIES HEREBY SUBMIT TO THE JURISDICTION OF THE UNITED STATES DISTRICT COURTS FOR THE PURPOSES OF ALL LEGAL PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, TO THE EXTENT SUCH COURT HAS PERSONAL AND SUBJECT MATTER JURISDICTION OVER SUCH PROCEEDINGS.

(c) EACH PARTY HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.

17.9 Dispute Resolution

(a) In the event a dispute arises between Buyer and Seller regarding the application or interpretation of, or in any way relating to this Agreement, Buyer and Seller shall use reasonable efforts to reach a reasonable and equitable resolution of the matter within sixty (60) days. In the event such efforts do not result in the resolution of the dispute, either Party may by written notice request the other Party to designate a member of its management with settlement authority to meet at the Plant, or at any other mutually agreed location, to resolve the dispute. The designated officers shall meet within twenty

(20) days following the notice date unless a later date is specified in the notice, to resolve the dispute.

(b) If the procedures referenced in the preceding paragraph do not result in resolution of the dispute within five (5) days after commencement of the referenced officers' meeting (and in any event within the time which legal or equitable proceedings based on such claim, dispute, or controversy would not be barred by the applicable statute of limitations), the Parties may agree, but neither Party will have any obligation to agree, to submit the dispute to binding arbitration. Any agreement to arbitrate a dispute must be evidenced by a writing signed by both Parties. Each Party will have the right to designate an arbitrator of its choice, who need not be from the American Arbitration Association ("**AAA**") panel of arbitrators but who will not have been previously an employee or agent of or consultant or counsel to either Party and will not have a direct or indirect interest in either Party or the subject matter of the arbitration. Such designation will be made by notice to the other Party within 10 Days or, in the case of payment disputes, five Days after the date of the giving of notice of the demand for arbitration. The arbitrators designated by the Parties will designate a third arbitrator, who will have a background in legal and judicial matters (and who will act as chairman), within 10 Days or, in the case of payment disputes, five Days after the date of the designation of the last of the arbitrators to be designated by the Parties, and the arbitration will be decided by the three arbitrators. Such arbitration will be held in alternating locations of the home offices of the Parties, commencing with Buyer's home office, or in any other mutually agreed upon location. The rules of the AAA will apply to the extent not inconsistent with the rules herein specified. Each Party will bear its own expenses (including attorneys' fees) with respect to the arbitration.

(c) Each Party understands that this Agreement contains an agreement to arbitrate only with respect to specified disputes that the Parties mutually agree in writing to arbitrate. After signing this Agreement, each Party understands that it will not be able to bring a lawsuit concerning any dispute that the Parties have mutually agreed in writing to arbitrate. Any Party to a dispute that has submitted for arbitration by written agreement may apply to a court of competent jurisdiction under this agreement for injunctive relief on preliminary matters necessary to protect the rights or property of that Party pending establishment of the arbitration panel. Any award of the arbitrators may be enforced by the Party in whose favor such award is made in any court of competent jurisdiction.

(d) Unless otherwise agreed in writing, each Party will diligently continue to perform its obligations under this Agreement during the pendency of any disputes or arbitration proceedings so long as all undisputed amounts payable hereunder have been paid. Except as may be required by law or regulation, no Party to a dispute, nor an arbitrator, may disclose the existence, content or results of any settlement discussions or arbitration award without the prior written consent of the Parties.

17.10 No Residual Value

This Agreement shall not be construed to provide any residual value to either Party or its successors or any other Party, for rights to, use of, or benefits from the other Party's system following expiration of this Agreement.

17.11 No Third Party Beneficiary

No provisions of this Agreement shall in any way inure to the benefit of any customer, or any other third party (other than Financing Parties) so as to constitute any such person as a third-party beneficiary under this Agreement, or of any one or more of the terms of this Agreement or otherwise give rise to any cause of action in any person not a Party hereto.

17.12 Entire Agreement; Modification and Waiver; Severability

(a) This Agreement and the other agreements referred to herein, constitute the entire agreement between the Parties relating to the transaction described in this Agreement and supersede any and all prior oral or written understandings. No addition to or modification of any provision of this Agreement shall be binding upon either Party, and neither Party shall be deemed to have waived any provision of this Agreement or any remedy available to it unless such addition, modification or waiver is in writing and signed by a duly authorized officer of such Party.

(b) If any term of this Agreement is found to be unenforceable, this Agreement will remain in full force and effect except that the unenforceable term will be replaced, by good faith agreement of the Parties, with an enforceable term as similar as possible to the unenforceable term.

17.13 Financing Liens.

(a) Seller, without approval of Buyer, may, by security, charge or otherwise encumber its interest under this Agreement for the purposes of financing the development, construction and/or operation of the Plant and the Interconnection Facilities.

(b) Promptly after making such encumbrance, Seller shall notify Buyer in writing of the name, address, and telephone and facsimile numbers of each Financing Party in favor of which Seller's interest under this Agreement has been encumbered. Such notice shall include the names of the account managers or other representatives of the Financing Parties to whom all written and telephonic communications may be addressed.

(c) After giving Buyer such initial notice, Seller shall promptly give Buyer notice of any change in the information provided in the initial notice or any revised notice.

(d) If Seller encumbers its interest under this Agreement as permitted by this Section 17.13, the following provisions shall apply:

(i) The Parties, except as provided by the terms of this Agreement, shall not modify or cancel this Agreement without the prior written consent of the Financing Parties;

(ii) The Financing Parties or their designees shall have the right, but not the obligation, to perform any act required to be performed by Seller under this Agreement to prevent or cure an Event of Default by Seller and such act performed by the Financing Parties or their designees shall be as effective to prevent or cure an Event of Default as if done by Seller; and

(iii) Buyer shall upon request by Seller execute statements certifying that this Agreement is unmodified (or, modified and stating the nature of the modification), in full force and effect and the absence or existence (and the nature thereof) of Events of Default hereunder by Seller and documents of consent to such assignment to the encumbrance and any assignment to such Financing Parties.

Upon the receipt of a written request from Seller or any Financing Parties, Buyer shall execute, or arrange for the delivery of, such certificates, opinions and other documents as may be reasonably necessary in order for Seller to consummate any financing or refinancing of the Plant or any part thereof and will enter into reasonable agreements with such Financing Parties, which agreements will grant certain rights to the Financing Parties as more fully developed and described in such documents, including (a) this Agreement shall not be terminated (except for termination pursuant to the terms of this Agreement) without the consent of Financing Parties, which consent is not to be unreasonably withheld or delayed, (b) Financing Parties shall be given notice of, and the opportunity to cure as provided herein, any breach or default of this Agreement by Seller, (c) if the Financing Party forecloses, takes a deed in lieu of foreclosure or otherwise exercises its remedies pursuant to any security documents, then (i) Buyer shall, at Financing Party's request, continue to perform all of its obligations hereunder, and Financing Party or its nominee may perform in the place of Seller, and may assign this Agreement to another Person in place of Seller, (ii) Financing Parties shall have no liability under this Agreement except during the period of such Financing Party's ownership or operation of the Plant and (iii) Buyer shall accept performance in accordance with this Agreement by Financing Party or its nominee, and (d) Buyer shall make representations and warranties to Financing Parties as Financing Parties may reasonably request with regard to (1) Buyer's existence, (2) Buyer's authority to execute, deliver and perform this Agreement, (3) the binding nature of the document evidencing Buyer's consent to assignment to Financing Parties and this Agreement on Buyer and (4) receipt of regulatory approvals by Buyer with respect to its execution and performance under this Agreement.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed as of the day and year first above written.

Benton County Wind Farm LLC

By: [signature]
Name: James J Eisen
Title: Vice President

PSI Energy, Inc. d/b/a Duke Energy Indiana, Inc.

By: [signature]
Name: Kay Pashos
Title: President

EXHIBIT A

Purchase Price

| Calendar Year Delivered | Dollars per MWh |
|---|---|
| 2007 | [redacted] |
| 2008 | |
| 2009 | |
| 2010 | |
| 2011 | |
| 2012 | |
| 2013 | |
| 2014 | |
| 2015 | |
| 2016 | |
| 2017 | |
| 2018 | |
| 2019 | |
| 2020 | |
| 2021 | |
| 2022 | |
| 2023 | |
| 2024 | |
| 2025 | |
| 2026 | |
| 2027 | |
| 2028 | [redacted] |

EXHIBIT B- Form of Payment Guaranty

Guaranty

This Guaranty (this "**Guaranty**"), dated as of ____________, 2006, is made and entered into by ____________________ ("**Guarantor**") for the benefit of **PSI Energy, Inc. d/b/a/ Duke Energy Indiana, Inc.**, an Indiana corporation ("Counterparty")

**WITNESSETH:**

WHEREAS, Counterparty and **Benton County Wind Farm LLC**, a Delaware limited liability company, which is an indirect, wholly-owned subsidiary of Guarantor ("**Seller**"), have entered into that certain Renewable Wind Energy Project Purchase Power Agreement dated as of September 1, 2006, as amended (including all future renewals and amendments thereto, the "**Agreement**"); and

WHEREAS, Guarantor will directly or indirectly benefit from the execution, delivery and performance of the Agreement;

WHEREAS, it is a condition precedent to the execution and delivery of the Agreement that Guarantor execute and deliver this Guaranty to Counterparty;

NOW THEREFORE, in consideration of Counterparty entering into the Agreement, Guarantor hereby covenants and agrees as follows:

1. GUARANTY. Subject to the provisions hereof, Guarantor hereby irrevocably and unconditionally guarantees the timely payment when due of the payment obligations of Seller to Counterparty under the Agreement (the "**Obligations**"), provided that, notwithstanding anything to the contrary in this Guaranty, the aggregate amount for which Guarantor shall be liable under this Guaranty shall in no event exceed Five Million U.S. Dollars (US$ 5,000,000) (the "**Maximum Recovery Amount**"). This Guaranty shall constitute a guarantee of payment and not of collection.

2. DEMANDS AND PAYMENT. If Seller fails to make a payment to Counterparty when such payment is due under the Agreement, Counterparty may make a demand to Guarantor for payment hereunder. Any demand by Counterparty for payment hereunder shall be in writing, signed by a duly authorized representative of Counterparty and delivered to Guarantor pursuant to Section 10 hereof, and shall (a) reference this Guaranty, (b) specifically identify the amount of such guaranteed Obligations and the provision of the Agreement pursuant to which such amount is due from Seller and (c) set forth payment instructions. There are no other requirements of notice, presentment or demand. Guarantor shall pay, or cause to be paid, such guaranteed Obligations within three (3) "Business Days" (as such term is defined in the Agreement) of receipt of such demand.

3. REPRESENTATIONS AND WARRANTIES. As of the date hereof, Guarantor represents and warrants that:

(a) it is a corporation duly organized and validly existing under the laws of the State of __________ and has the corporate power and authority to execute, deliver and carry out the terms and provisions of the Guaranty;

(b) no authorization, approval, consent or order of, or registration or filing with, any court or other governmental body having jurisdiction over Guarantor is required on the part of Guarantor for the execution and delivery of this Guaranty; and

(c) this Guaranty constitutes a valid and legally binding agreement of Guarantor, except as the enforceability of this Guaranty may be limited by the effect of any applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and by general principles of equity.

4. SETOFFS AND COUNTERCLAIMS. Without limiting Guarantor's own defenses and rights hereunder, Guarantor reserves to itself all rights, setoffs, counterclaims and other defenses to which Seller is or may be entitled to arising from or out of the Agreement or otherwise, except for defenses arising out of the bankruptcy, insolvency, dissolution or liquidation of Seller or the lack of power or authority of Seller to enter into and/or perform the Agreement, or otherwise waived herein.

5. AMENDMENT OF GUARANTY. No term or provision of this Guaranty shall be amended, modified, altered, waived or supplemented except in a writing signed by Guarantor and Counterparty.

6. WAIVER. Guarantor hereby waives (a) notice of acceptance of this Guaranty; (b) presentment and demand concerning the liabilities of Guarantor; and (c) any right to require that any action or proceeding be brought against Seller or any other person, or to require that Counterparty seek enforcement of any performance against Seller or any other person, prior to any action against Guarantor in accordance with the terms hereof.

Except as to applicable statutes of limitation, no delay of Counterparty in the exercise of, or failure to exercise, any rights hereunder shall operate as a waiver of such rights, a waiver of any other rights or a release of Guarantor from any obligations hereunder.

Guarantor consents to the renewal, compromise, extension, acceleration or other changes in the time of payment of or other changes in the terms of the Obligations, or any part thereof or any changes or modifications to the terms of the Agreement.

7. SETTLEMENTS CONDITIONAL. Guarantor agrees that this Guaranty shall continue to be effective or shall be reinstated, as the case may be, if all or any part of any payment made hereunder is at any time avoided or rescinded or must otherwise be restored or repaid by Counterparty as a result of the bankruptcy of Seller, all as though such payments had not been made.

8. TERMINATION. This Guaranty shall remain in full force and effect until the earlier to occur of: (a) the date on which the Agreement has been terminated and all Obligations have been indefeasibly satisfied in full and (b) payment by Guarantor of the Maximum Recovery Amount. Upon any termination of this Guaranty, Counterparty shall return the original Guaranty to Guarantor upon Guarantor's request in writing.

9. SUBROGATION. The Guarantor will not exercise any rights that it may acquire by way of subrogation until all Obligations shall have been indefeasibly paid in full. Subject to the foregoing, upon payment of all such Obligations, the Guarantor shall be subrogated to the rights of the Counterparty against the Company, and the Counterparty agrees to take at the Guarantor's expense such steps as the Guarantor may reasonably request to implement such subrogation

10. NOTICE. Any notice, request, instruction, correspondence or other document to be given hereunder by any party to another (herein collectively called "**Notice**") shall be in writing and delivered personally

or mailed by certified mail, postage prepaid and return receipt requested, or by telegram or telecopier, as follows:

To Counterparty:

To Guarantor:

Notice given by personal delivery or mail shall be effective upon actual receipt. Notice given by telegram or telecopier shall be effective upon actual receipt if received during the recipient's normal business hours, or at the beginning of the recipient's next business day after receipt if not received during the recipient's normal business hours. All Notices by telegram or telecopier shall be confirmed promptly after transmission in writing by certified mail or personal delivery. Any party may change any address to which Notice is to be given to it by giving notice as provided above of such change of address.

11. MISCELLANEOUS. This Guaranty shall in all respects be governed by, and construed in accordance with, the law of the State of New York, without regard to principles of conflicts of laws (other than Section 5-1401 of the New York General Obligations Law).

This Guaranty shall be binding upon Guarantor and its permitted successors and assigns and inure to the benefit of and be enforceable by Counterparty and its permitted successors and assigns. Guarantor may not assign this Guaranty in part or in whole without the prior written consent of Counterparty. Counterparty may not assign its rights or benefits under this Guaranty in part or in whole except with the prior written consent of Guarantor. Neither Guarantor nor Counterparty will unreasonably withhold or delay consent to assignment.

This Guaranty embodies the entire agreement and understanding between Guarantor and Counterparty and supersedes all prior agreements and understandings relating to the subject matter hereof.

The headings in this Guaranty are for purposes of reference only, and shall not affect the meaning hereof.

Words importing the singular number hereunder shall include the plural number and vice versa and any pronouns used herein shall be deemed to cover all genders. The term "person" as used herein means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated association, or government (or any agency or political subdivision thereof).

Wherever possible, any provision in this Guaranty which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective only to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any one jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

IN WITNESS WHEREOF, Guarantor has executed this Guaranty as of the day and year first above written.

[GUARANTOR]

By: ______________________________

Name: ______________________________

Title: ______________________________